## JUNE, 1911.

### R. W. KEMPER v. THE STATE.

#### No. 855.   Decided June 23, 1911.

**1.—Murder—Evidence—Declarations of Third Party.**

Upon trial of murder, declarations of a third party made to defendant after the shooting was over, and which formed no part of the transaction are inadmissible.

**2.—Same—Evidence—Impeaching Witness.**

Upon trial of murder, where a witness for the defendant had given material testimony for the defendant, it was not admissible, for the purpose of impeaching said witness, to show that he had been charged with an assault on a third party not involving moral turpitude; especially where he was not permitted to explain the assault.

**3.—Same—Evidence—Declaration of Third Parties.**

Upon trial of murder, it was inadmissible to admit testimony as to the statements of a witness to a third party with reference to the killing, which did not refer to the defendant.

**4.—Same—Evidence—Threats.**

On trial of murder, there was no error to exclude testimony as to what one witness had told another with reference to some threats against defendant, as the communication of the alleged threats should have been established by the witness who communicated the same to defendant; it not appearing that such witness was inaccessible.

**5.—Same—Evidence—Declarations of Deceased.**

Upon trial of murder, where the witness had testified that the deceased made a threat against defendant, it was error to permit the State's counsel to ask the witness whether the deceased told witness that he had heard that the defendant was talking about him.

**6.—Same—Evidence—Contradicting Witness.**

Upon trial of murder, it was error to permit State's counsel on cross-examination of defendant's witness to compel him to testify that his jaw had been cut off by a negro; that he had been in two or three shooting scrapes; that he had killed one man and shot another, etc., without permitting said witness to explain the circumstances as to these matters and that the witness was in the right, and the error was not cured by afterwards withdrawing this testimony from the jury after several of the arguments had been made.

**7.—Same—Withdrawal of Illegal Testimony—Rule Laid Down.**

Where testimony has been admitted which is calculated to injure or prejudice the rights of the defendant, or which is calculated to seriously affect

the credibility of the witness or the defendant, or to affect the weight of the testimony, the court can not hereafter withdraw such testimony from the consideration of the jury and thereby cure the harm or the error committed by the introduction thereof. Following Clements v. State, 61 Texas Crim. Rep., 161, and other cases.

### 8.—Same—Evidence—Threats.

On trial of murder there was no error in excluding testimony of alleged threats, as the same contained no threats by the deceased against the defendant either to take his life or to do him personal violence; there being no question from the evidence already introduced that there was ill-feeling between the parties.

### 9.—Same—Evidence—Credibility of Witness.

Upon trial of murder there was no error in permitting the State to show over the objection of the defendant that one of his witnesses had spent 120 days on the county farm and in jail; defendant having the right to explain this if he desired.

### 10.—Same—Conduct of State's Counsel.

Where, upon trial of murder, defendant's witness had testified to threats by the deceased against the defendant, and upon cross-examination admitted that he and deceased had been friendly, it was reversible error to permit private counsel for the prosecution in the presence and hearing of the jury to remark to the witness, "And this is the favor he gets in return," meaning the deceased.

### 11.—Same—Evidence—Practice on Appeal.

Where the errors complained of as to permitting State's counsel to ask defendant's witness certain questions, will not probably occur on another trial they need not be considered on appeal.

### 12.—Same—Withdrawing Objection—Remarks by Court.

On trial of murder, where defendant's witness had testified to a statement claimed to have been made by the deceased to the witness to which the State objected, which objection the court sustained, remarking that the statement contained no threat and was inadmissible for any purpose, whereupon the State withdrew its objection and the court told the jury that the testimony would be admitted, this was improper.

### 13.—Same—Practice on Appeal.

Where, upon trial of murder, defendant complained of the action of the court in making certain rulings and in his treatment of counsel for the defendant, and the case was reversed on other grounds and such condition would not probably occur on another trial, the same need not be considered on appeal.

### 14.—Same—Evidence—Explanation by Defendant.

Upon trial of murder, the court should have admitted testimony in explanation as to why the defendant happened to be at the place where the homicide occurred at the time; and it was improper to rule out this testimony and then admit the same after the State's exception thereto was withdrawn.

### 15.—Same—Evidence—Credibility of Witness.

Upon trial of murder there was no error in permitting State's counsel to ask one of defendant's witnesses if he had not testified on the habeas corpus trial to facts that were beneficial to the defendant.

### 16.—Same—Evidence—Withdrawal of Illegal Testimony.

Upon trial of murder it was reversible error of the court to permit State's counsel to ask the witness illegal questions as to the witness' past conduct, and compel him to answer same, and then withdraw said testimony after the

same had been discussed by counsel before the jury; the defendant having duly excepted thereto in proper time.

### 17.—Same—Remarks by Judge—Practice.

The law requires the court to rule upon the admissiblity of testimony but prohibits him from expressing any opinion as to the weight to be given thereto, and a remark that the testimony was of no value was improper.

### 18.—Same—Evidence—Declarations of Defendant.

Upon trial of murder, declarations of the defendant with reference to the deceased were admissible.

### 19.—Same—Evidence—Credibility of Witness.

Upon trial of murder, testimony pertaining to a charge of illegally obtaining money from other persons on the part of the defendant was inadmissible.

### 20.—Same—Evidence—Contradicting Witness.

Upon trial of murder, it was error to permit the State's counsel to ask the defendant while he was upon the witness stand as to what a deceased witness had testified to at the habeas corpus trial, and if he, defendant, did not wait till after said witness was dead to deny a statement which the State claimed had been testified to by the deceased witness in said habeas corpus trial.

### 21.—Same—Evidence—Credibility of Witness.

Upon trial of murder, the court should not have permitted State's counsel to ask defendant's witness if as a saloon keeper he had not violated the Sunday law.

### 22.—Same—Evidence—Credibility of Witness.

Upon trial of murder, there was no error in permitting State's counsel upon cross-examination of defendant's witness to ask him if he had not been indicted for the offense of sand-packing cotton.

### 23.—Same—Evidence—Impeaching Witness—Predicate.

Impeaching testimony should be confined in substance to the language of the predicate laid, and the witness should be asked the direct question and in the exact language of the predicate.

### 24.—Same—Argument of Counsel.

Where the argument of State's counsel was in answer to arguments which had previously been made by counsel for the defendant, there was no error.

### 25.—Same—Argument of Counsel.

While it was improper for State's counsel in his closing argument to challenge the defendant's counsel to place a State's witness upon the witness stand for the purpose of developing evidence which both parties had an opportunity to develop before but declined, yet defendant's counsel could not discuss this matter and then deny the State the right to let the witness testify, and there was not error.

### 26.—Same—Evidence—Reputation of Deceased.

Upon trial of murder, where the State had shown that the reputation of the deceased as a peaceable, law-abiding citizen was good, there was no error in not permitting the defense to show that the deceased was accused of burning a barn.

### 27.—Same—Evidence—Threats—Entire Statement.

Upon trial of murder, it was error to permit State's counsel to introduce testimony of a witness upon habeas corpus trial for the purpose of impeaching said witness, and refuse to permit the defendant to introduce the remaining portion of the testimony on the same subject in explanation thereof.

**28.—Same—Charge of Court—Self-Defense—Apparent Danger.**

Where, upon trial of murder, the defendant submitted a special charge to the effect that if the defendant believed the deceased was armed, and had any reasonable ground for such belief then the defendant would have the right in law to act upon such belief even though in fact the deceased was not armed, the same should have been submitted to the jury, the main charge of the court not including this phase of the case.

**29.—Same—Jurisdiction—Change of Venue.**

Where the record showed on appeal that defendant was present both in person and by counsel at the time the order was entered changing the venue and made no objection, there was no error.

**30.—Same—Evidence—Confronting Witnesses—Bill of Rights.**

The testimony of a witness, taken in an examining trial, or in a habeas corpus proceeding, or in any other preliminary investigation, where the witness, subsequent to giving the testimony, but before the trial of the accused upon indictment, dies or removes from the jurisdiction of the State, without any responsibility therefor being chargeable against the accused, is not admissible against the defendant in a trial of the defendant upon indictment for a felony, no matter how the testimony may have been taken and preserved, and this although defendant was present on said preliminary trial and afforded an opportunity to cross-examine the witness. Overruling Porch v. State, 51 Texas Crim. Rep., 7; Hobbs v. State, 54 Texas Crim. Rep., 71; Pratt v. State, 53 Texas Crim. Rep., 281. Prendergast, Judge, dissenting.

**31.—Same—Constitutional Law.**

The defendant in a criminal case under the Constitution, section 10, Bill of Rights, is entitled to be confronted by the witnesses against him, and he and the jury should have the opporunity of looking upon the witness and observing his demeanor on the stand while giving his testimony. Following Cline v. State, 36 Texas Crim. Rep., 320, and other cases.

**32.—Same—Constitutional Law—Preliminary Proceedings—Criminal Prosecution.**

Any preliminary proceedings which antedate and precede the formal presentation against the accused by a bill of indictment, charging him with a felony and to which he pleads not guilty, thereby joining issue between himself and the government, which issue is to be determined by a jury of his countrymen, does not and can not form any part of the criminal prosecution referred to in section 10 of the Bill of Rights.

**33.—Same—Evidence—Reproduction of Testimony.**

Where, upon trial of murder, the record on appeal showed that the testimony of an alleged dead witness, which was reproduced on the final trial, was not taken and preserved in the manner prescribed by the statute the same was inadmissible, aside from the constitutional objection thereto.

Appeal from the District Court of Ellis. Tried below before the Hon. W. C. Wear.

Appeal from a conviction of manslaughter; penalty, three years imprisonment in the penitentiary.

The defendant and the deceased were rival candidates for the office of constable at the time of the homicide, and much ill-feeling existed between them growing out of this circumstance and a former estrangement. Two witnesses for the State who saw the killing testified that while they were in friendly conversation with the deceased, who was on horseback in the street of the little town where the homicide occurred, near the house of the justice of the peace, the defendant drove

up rapidly in his buggy, and when near them got out with his shotgun, and they heard the deceased say, "Bob, don't do that," but the defendant kept walking rapidly towards where they were, and that the deceased slipped down on the left side of his horse, crouching behind it while the defendant came up, and while the deceased raised up somewhat the defendant shot him right over the seat of the saddle of the deceased, taking deliberate aim at the deceased, the shot taking effect in the head of deceased, of which he died in a short time; that the defendant remarked, "Dig for it; you talk about me, you God damn old gray-headed s—— of b——. You can take his gun off of him now," and then left. That the deceased was unarmed at the time and made no hostile demonstration.

The State further showed that shortly before the homicide the defendant was seen in the witness Holton's office, near the house of the State's witness and the scene of the homicide, and that the defendant looked out of the window several times as though he was expecting something to come up or looking for something to come up.

The State also, by the reproduced testimony of the dead State's witness, who was then the justice of the peace, showed that on the morning of the killing the deceased had told witness that there had been several talks made that were not true about the deceased and the defendant, and that he hoped that there would not be any more of them reported, that he wanted everything carried on peaceably, etc.; that the witness told the defendant on the morning of the killing, before it occurred, what deceased had told witness, and that defendant replied that such talk had been made before, and he couldn't listen to anything like it as being true, and that if deceased made another crooked move at him he would kill the "God damn gray-headed s—— of a b——."

The defendant proved many threats by the deceased which had been communicated to him during the last three weeks before the homicide, the last communication of a recent threat occurring on the evening before the homicide, wherein the deceased threatened to kill the defendant on sight. The defendant testified that, while he was carrying a shotgun in self-defense, the meeting between him and the deceased was entirely accidental, and denied the testimony of the witness that he was looking out of the window for something. He also denied the statement made by the dead witness. As to the immediate facts of the killing, he testified that he was on his way to make some returns as constable, and as he drove down towards the justice of the peace's house, which was near the scene of the homicide, he recognized the deceased; that the deceased was looking at him, and put his right hand to his breast, springing from his horse; that defendant jerked his horse and reached for his gun and got out of his buggy, when the deceased was squatting or peeping under the horse, etc., and that the defendant believed the deceased was about to shoot him from there; that he could see the deceased dodging, and as defendant came up he,

defendant, looked over the horse and fired; that he shot at deceased because he thought the latter was going to kill him, from the threats he had made and on account of the movements with his hands to his breast; that after he shot him he spoke to one of the State's witnesses, saying, "Go and get that pistol, or that gun; go and get it;" that if he said anything else he does not remember it.

The witness Holton testified for the defendant that he met him several times on the morning of the shooting in company with other parties, and noticed nothing unusual, and that defendant had not been looking out of his office for something to come up, etc., as testified to by State's witness, as he could have seen this; that there was no premeditation either by himself or the defendant to harm the deceased at the time, although there was ill-feeling existing between all the parties. He also testified that he saw the immediate shooting as he walked out to his buggy to unhitch his horse and while he was unhitching him from a post to which the horse was tied; that when defendant's buggy came into view he noticed that the deceased, slightly turning to the right, straightened up in his saddle and reached for his right breast, and when witness looked back for the defendant the latter was getting out of his buggy, or rather was out, and deceased rolled right off his horse with his back to defendant, and turning round, was on the opposite side of the horse, defendant advancing towards the horse and presenting his gun in four or five steps of deceased, when one of the State's witnesses halloaed, "You, Bob; you, Bob," twice; that when the deceased dodged down behind the horse his left hand came in view under the horse, when defendant presented the gun down towards the horse's belly; then the deceased raised up quickly, and defendant's gun was fired right between the seat of the saddle, etc. The defendant also introduced testimony as to the dangerous and quarrelsome character of deceased, which the State sought to rebut. While the testimony is very voluminous, the above are the salient features of the case, which, taken in connection with the facts in the opinion, is a sufficient statement of the case.

*Harper, Doyle & Jackson* and *Williams & Williams,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

SCOTT, SPECIAL JUDGE.—Appellant was indicted by the grand jury of Limestone County, Texas, charged with the murder of one B. D. Persons, by shooting him with a gun. The presiding judge of the District Court of Limestone County, on his own motion, ordered a change of venue to Ellis County, Texas, in which county the case went to trial on the 25th day of April, 1910, which resulted in a conviction of the defendant of the offense of manslaughter, and his punishment assessed was confinement in the penitentiary for a term of three years.

There are numerous bills of exception in the record which we will take up and dispose of in the order in which they appear in the record.

Bill of exceptions No. 2 complains that the court permitted the State's witness, Mrs. J. G. Stovall, while upon the stand, to testify that the shooting which resulted in the death of Persons occurred in front of her house, and that she was in the rear of her house, and after hearing the report of the gun she immediately went to the front door of her house, where she saw the deceased and the defendant; the defendant was unbreeching his gun, and the witness asked the defendant why he did it, to which the defendant made no response. The State was then permitted by the court to ask the witness what she said to the defendant, to which question the defendant objected, stating his reasons. The court overruled the objection, and the witness was permitted to state that she said to the defendant, "My God, Bob, why did you do that? Don't shoot again."

This bill is approved without any explanation whatever, and as there is no testimony in the record which shows that the defendant attempted to fire the second time at the deceased, this testimony was inadmissible for any purpose, it appearing from the bill and from the record that the statement of the witness to the defendant occurred after the shooting was over, and therefore formed no part of the transaction.

Bill of exceptions No. 3 complains that, "While the defendant's witness, Walter Wright, was upon the stand, and had given material testimony for the defendant, the court permitted the State to elicit from said witness that at one time he had complaint filed against him in the County Court of Limestone County, Texas, charging him with making an assault upon a minister of the gospel, and after the witness had been compelled by the court to so testify, the defendant then offered to prove by way of explanation that the minister upon whom he was charged with having made an assault had, upon trial, been found guilty of making an unprovoked assault upon him in the County Court of Limestone County, and a fine of $250 assessed against him by the jury." The court, in approving this bill of exceptions, states that the entire evidence referred to above was subseqently withdrawn from the jury, with instructions not to consider the same for any purpose whatsoever.

We think the admission of the testimony to the effect that the witness had been charged with making an assault upon another at some time in the past, was inadmissible for any purpose. It is not admissible for the purpose of impeaching the witness, because it did not involve moral turpitude; it did not show when the assault, if any, ever occurred, and in order for testimony of this character to be admissible by way of impeachment it must relate in some way to the transaction under investigation, or must involve upon the part of the witness moral turpitude. Hence we hold that the court erred in admitting this testimony. And certainly, if it was admissible for any purpose,

the defendant had the right, and it was justice to the witness, to have him explain the circumstances under which the assault was made, if any, and the refusal of the court to permit the defendant to show by this witness, as it is alleged he could have done, that instead of the witness being guilty of assault upon the minister of the gospel, the minister had made an unprovoked assault upon the witness, and in a trial in the County Court of Limestone County for said assault by said minister upon the witness, the minister had been found. guilty, and a fine of $250 assessed against him. We hold that no part of this testimony · was admissible for any purpose whatever, and it could only have been introduced for one purpose, and that to prejudice the minds of the jury against the witness, and thereby affect his credibility and the weight of his testimony, thus depriving the defendant of the full force of the witness' testimony, the bill of exceptions ·showing that he had given material testimony for the defendant. Nor do we think that the error of the court was in any manner cured by the fact that it was afterwards withdrawn. The effort upon the part of the court to withdraw from the consideration of the jury testimony which was erroneously admitted will be discussed in another part of this opinion.

Bill of exceptions No. 5 complains that, "While the defendant's witness, Walter Wright, was upon the stand, and after he had given material testimony for the defendant on cross-examination, the State's counsel was permitted, over the objection of the defendant, to ask the defendant the following question: "Is it not true that after he was killed, either at your home or in Prairie Hill, you told Tom Moody that at the time Persons was killed there were three or four men ready to kill him, and going to kill him," To which the witness answered: "I don't know whether I did to Moody or not. I know I did not make the exact statement that you made."

This evidence was immaterial, and should not have been allowed to go to the jury. ·It is wholly immaterial whether this witness told Tom Moody or any other person that there were several men who were ready to kill said Persons or not, unless the State had undertaken to go further and show that this defendant was one of the men referred to by the witness, and hence we hold that the question was improper, and that the answer was immaterial.

Bill of exceptions No. 6 complains that, "While the defendant's witness, Wes Alston, was on the stand, and after he had given material testimony for the defendant, and after the other testimony in the case had raised the issue of self-defense and an issue as to whether ·deceased or defendant had made the first hostile demonstration at the time of the homicide, the court erred in excluding the testimony of the said witness as follows: In substance, that he, witness, told one Busby to tell Bob Kemper (defendant) that he, witness, had heard Persons make the threat that he (Persons) intended to kill him (defendant), and for him (defendant) to be careful to keep his eyes on the old man, and not to do anything until he was forced to do it." We do

not think the action of the court in excluding this testimony was error. It does not appear from the bill of exceptions that Busby was dead or beyond the jurisdiction of the court, nor that Busby had denied the fact that he had ever communicated such a threat to the defendant, and unless one of these conditions existed, if the defendant desired to show that the threat had been communicated to him, he should have undertaken to establish that fact by the witness Busby, because it was immaterial what the witness Wes Alston had told Busby. The material inquiry was, What was in fact told to the defendant? Therefore, we hold that this evidence was not admissible, and the court did not commit error in excluding the same.

Bill of exceptions No. 7 complains that, "While the defendant's witness, Wes Alston, was upon the stand, and after the other testimony in the case had raised the issue of self-defense, and the issue as to whether the deceased or defendant had made the first hostile demonstration 'at the time of the homicide, and after said witness had testified upon direct examination that he heard the deceased, Pen Persons, a short time before the homicide, in the town of Mart, make a threat to take the life of the defendant, the court permitted the State to cross-examine said witness, and to propound the following question to said witness: 'Is it not true that in that same conversation Mr. Persons told you he had heard that Bob Kemper was talking about him?'"

The witness answered in the affirmative. This evidence, as presented by the bill, was wholly immaterial to the issue before the court and jury, and should have been excluded. If the State had undertaken to show by this witness that he had communicated to the defendant, in connection with the threat, the statement involved in the question propounded, namely, that the deceased, in the same connection in which he is alleged to have made the threat, said that he had heard that the defendant had threatened to kill him, or some threat concerning him, then the question would have been proper and the answer would have been pertinent. But unless the defendant had been informed of the conditions under which the threat was made (if it was in fact made), it would be wholly immaterial to the issue presented what the deceased said to some other person in connection with said threat. It would not change in any manner the rights of the accused, and therefore would be immaterial, and would have a tendency to prejudice before the jury the rights of the defendant.

Bills of exception Nos. 8 and 9 complain that, "While the defendant's witness, Wes Alston, was upon the stand, the State was permitted to prove by said witness that his jaw had been shot off by a negro; that he had been in two or three shooting scrapes; that he had killed one man and shot another one, and the State was permitted to ask the witness if he had killed his man, and compelled the witness to answer the question, and he answered that he had killed a man, whereupon the defendant offered to prove by said witness upon re-direct examina-

tion that the negro who shot the witness' jaw was charged with assault to commit rape on a white woman, and the witness was an officer, and was trying to arrest said negro at the time of said offense; that the other man that he shot had knocked his father in the head with an iron rod and was seeking to again strike his father, who was down, with his skull crushed, and he fired solely to keep the man from killing his father, and the defendant offered to prove by the same witness, in connection with the question propounded by the State, wherein he was asked if he had killed his man, and his reply thereto, that he had killed a man, by way of explanation thereof, and in order that the witness might appear in a proper light before the court and jury; that the witness had killed a man named Gresham; that at the time of the killing the witness was city marshal of the town of Thornton, and that Gresham had been misbehaving and getting drunk, and he had talked to Gresham about it, and Gresham had threatened to kill said witness, and that he was trying to avoid the presence of Gresham, and that his meeting up with him was purely accidental; that he attempted to leave him, and was shot by deceased twice in the back, and the witness then turned, drew his pistol, fired and killed Gresham." This character of questions as indicated by these bills of exception were highly improper. It is admissible, of course, for defendant or the State to show that the witness has been charged with murder, if such be a fact, but that must be done in a legitimate manner, and it would be a monstrous doctrine to hold that a witness upon the stand, in the presence of the jury who are not familiar with the character or disposition of the witness, will be compelled to answer a question that he had killed a man, and at the same time deny him the right to explain to the jury the circumstances under which he did the killing. The laws of our State recognize the fact that a man *may* kill another man and commit no offense whatever. He may be entirely justified in the act. It would be a monstrous doctrine to hold that a man may be held up before a jury as a murderer because of the fact that he has been unfortunate to have to kill a man where he was justified, and at the same time be denied the right to explain to the jury the circumstances under which he did it, and this court will never give its approval to any such doctrine. All persons in the witness chair are entitled to justice and fair dealing, to say nothing of the effect that such a proceeding may have upon the rights, the life and the liberty of a citizen who is on trial, and who has denied that he has committed any wrong.

The court, in approving these bills, "distinctly and emphatically withdrew from the consideration of the jury all the testimony as to the witness, Alston, killing anybody," but it appears in bill of exceptions No. 9 that this action upon the part of the court in excluding this testimony and withdrawing it from the jury did not take place until several of the arguments had been made to the jury and the testimony complained of argued by the attorneys to the jury. The court further explains bill of exceptions No. 9 by stating that, as to witness

Alston, the record shows that he testified: "I have killed one man and shot another one pretty badly. I have been in two or three shooting scrapes. I did not shoot the man who shot my lower jaw through. I did not shoot at this one. I gave them the first shots, and I told everybody who was running around over the whole country saying they were going to kill me I would give them the first shot, and I think that is as fair as a man could do. The fact that I killed a man and the fact that Bob killed one does not make a spirit of fellow-feeling between Bob and I—not a bit on earth. In fact, I am opposed to killing, and I would just as soon be killed as to kill a man.

"I was an officer at the time the negro shot me through the jaw. I was not indicted for any offense growing out of these shooting scrapes I have been in. I was an officer at the time each of them occurred."

According to this record, here is a man who was an officer of the law, whose duty it is to apprehend men charged with violating the law, and in the course of the discharge of his duty it became necessary for him, in his own self-protection, to shoot a man, and the court denies him the right to show that the man whom he shot had threatened his life, and had shot him twice in the back while he was going away from him, and permitted the jury to consider the fact that he had killed a man, and was thereby charged by the prosecuting attorney with murder, when the facts, as proposed to be shown, disclose that he was justified in his action. Again, the State charged him with killing another man, and made him confess it before the court, and made him confess it before the jury, and refused to let him explain that the reason he did it was, that the man he killed had knocked his father in the head with an iron rod, crushing his skull, and was about to strike his father again, and that in order to save his father's life he shot and killed the man, who was thus murdering his father. If these facts were true, he not only was not guilty of violating the law, but had done an honorable deed, one which all honorable men commend and respect him for doing. Again, the State seeks to make profert of this witness by showing to the jury, and calling attention to the fact, that he had his jaw shot off by a negro, well knowing the prejudice that existed among the people of this country where a white man "mixes up in a row" with a negro, and refused to permit the man to explain that, at the time, he was an officer, unarmed; a negro was charged with a heinous crime, which, if true, merited the death penalty, and which is invariably inflicted upon negroes committing such offenses in Texas; and in the discharge of his duty as officer and his duty as a common citizen, he was attempting to apprehend the negro thus charged with the offense, when his jaw was shot off by the negro. Will any man say that such an act upon this man under such circumstances was an offense, was wrong, was discreditable or dishonorable? Surely not. It is an act to be commended if these facts are true, and certainly, if the witness was willing to swear to

these facts, the defendant had a right, and his attorneys had the lawful right to have the jury hear the facts and pass upon them.   We can not conceive any principle of law upon which the court based his ruling in this respect, nor can we conceive of any principle of law which the prosecuting attorney could possibly have had in view when he protested to the court against the introduction of this testimony by the defendant.   It will not do to say that the testimony admitted over the objection of the defendant referred to in these bills of exception was afterwards by the court excluded, and the jury instructed not to consider the same, because it is clear to our minds that the effect of such a ruling as complained of here was prejudicial to the rights of the defendant, and could have no other effect than to prejudice the minds of the jury against the witness by whom the defendant had proven, according to the bill of exceptions, "material testimony in his behalf," and the court can never withdraw prejudicial and harmful testimony from the jury so as to relieve their minds of the effect which said testimony has made, and especially would this likely be true when this testimony had been before the jury for several days, and had been argued fully in several speeches.   The damaging character of this testimony, without the explanation as offered, is too apparent for us to hold that it did not have its weight with the jury in some respect, and this court has recently held that the court can not, after having admitted testimony prejudicial to the defendant, withdraw the same and thereby cure the harm and injury which might have resulted to defendant.   (See Clements v. State, 61 Texas Crim. Rep., 161.)   And we here now lay down the rule to be that, where testimony has been admitted before the jury which is calculated to injure or prejudice the rights of the defendant, or which is calculated to seriously affect the credibility of the witness for the defendant, or to affect the weight of his testimony, that the court can not thereafter withdraw said testimony from the consideration of the jury, and thereby cure the harm or the error committed by the introduction thereof.   The prosecuting officers of the State must understand, and the trial judges who make these rulings must understand, that this court will not hold such errors to be harmless, because we believe them to be harmful, and we recognize as correct the principle which was announced by one of the prosecuting officers in this case, according to the record, when, in referring to the withdrawing of testimony that had been erroneously admitted, he said: "On the principle that that which is once in can not be withdrawn."   For a correct rule governing the proposition presented under this bill of exceptions, we cite Clements v. State, 61 Texas Crim. Rep., 161, 134 S. W. Rep., 728, and authorities there cited; also Barth v. State, 46 S. W. Rep., 228, and authorities there cited.

Bill of exceptions No. 10 complains that the court refused to permit the defendant to prove by the witness J. G. Heath "that the deceased made certain statements with reference to the defendant at a

picnic a few days before the homicide." And also complains of the action of the court "towards counsel for the defendant when counsel for the defendant insisted upon explaining to the court the reasons why he thought the evidence was admissible." We do not think the testimony offered by this witness was admissible, as it contained no threat either to take the life or to do personal violence to the accused. There was no question between the State and the defendant as to the state of feeling between the defendant and the deceased. The evidence showed conclusively that there was ill-feeling between the two. Neither do we hold that the action of the court towards counsel complained of in this bill is error. And inasmuch as it is not likely to occur again in another trial, it will not be necessary for us to dwell· at any further length upon the matter. We hold that the exceptions in this bill are not well taken.

Bill of exceptions No. 12 complains of the action of the court in permitting the State to show over the objection of the defendant that defendant's witness, Frank Smith, had spent 120 days on the county farm and in jail. We do not think there was any error in the ruling of the court in this respect. If the witness had in fact served a term of imprisonment in the county jail the jury had a right to know it, and the defendant would have had a right, if he had so desired, to explain to the court and jury the circumstances under which he was required to serve the sentence, either upon the county road or in the county jail. There was no error in the ruling of the court in this respect.

Bill of exceptions No. 13 complains of the "action of the private prosecutor in this: That, while the defendant's witness, Frank Smith, was upon the stand, and after the State's counsel had developed the fact by the witness that the deceased had been in his lifetime friendly to the witness, and after the witness had testified for the defendant to material testimony in behalf of the defendant, same being threats alleged to have been made by the deceased to the witness, private counsel for the prosecution, in the presence and hearing of the court and jury, remarked: 'And this is the favor he gets in return' (meaning the deceased). Counsel for the defendant immediately objected to this remark of the private prosecutor on the ground that it was an improper attack upon the witness, and was highly prejudicial to the right of defendant, and was calculated to cause the jury to disregard and discredit the testimony of said witness, and the court was requested by defendant's counsel to instruct the jury not to consider this remark made by said prosecutor, which objections and which request made by the defendant's counsel were by the court overruled, and said remark allowed to stand without criticism or condemnation before the jury." We think this objection well taken. Every person who is charged with violating the laws of this State is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt. Penal Code, article 11. And this law exists for

the benefit of a person while he is a witness as well as the accused person. The statute of this State further provided that the court, in trying the case, shall never, under any circumstances, express his opinion, in the presence and hearing of the jury, as to the weight of testimony or credibility of a witness (article 767, Code Criminal Procedure), and while the statute does not prescribe this rule as to the prosecuting officer, it stands to reason that a prosecuting officer has no right to criticise a witness, nor to condemn him by expressing his opinion during the progress of the case at any other time or in any other manner than in his argument to the jury, and in our opinion the court should have withdrawn said remark from the jury and instructed them not to consider the same, and if the prosecuting officer did not know that he ought not to have expressed such an opinion under such circumstances, then the court should have told him what his duties were in the premises. There is a proper time in the trial of every case when the prosecuting attorney may give the jury the benefit of his views concerning the testimony, as well as the character of the witness, and when that time arrives the prosecuting officer may be exhaustive in this respect if he so desires, but he should not be permitted to do so at any other stage of the trial than that authorized by law.

Bill of exceptions No. 14 complains of the action of the court in permitting counsel for the State to ask the defendant's witness, while upon the stand, a number of questions as set out in said bill of exceptions which will probably not occur upon another trial of the case, and therefore we do not discuss the action of the court in this respect further.

Bill of exceptions No. 15 complains of the ruling of the court in the respect that "while the defendant's witness, J. R. Unger, was upon the stand, and had testified to a statement claimed to have been made by the deceased to the witness, the State objected to the testimony, and the court sustained the objection thereto, and stated in the presence and hearing of the jury that there was no threat in such statement, and it was inadmissible for any purpose, and instructed the jury not to consider the testimony of the witness, whereupon the State's counsel stated in the presence of the jury that inasmuch as the jury had heard the testimony, the State would withdraw its objection, and the court told the jury that the testimony would be admitted." This testimony was either admissible or not admissible, and the court should not have allowed the State's counsel to object to the testimony until the court had expressed the opinion to the jury that it was of no value, and should not be considered by them, and then announce to the court that he would withdraw his objections, and let the jury have the benefit of the statement. The court should have adhered to his original ruling, and declared the evidence inadmissible for any purpose, but we hold that the evidence was inadmissible, and the court erred in permitting the evidence to go to the jury at the instance of the State after he had declared to the jury that it was inadmissible for any pur-

pose, and had instructed them not to consider the same. We do not wish to be understood, however, as holding that this error would be sufficient to reverse the case.

Bill of exceptions No. 16 complains of the action of the court in making certain rulings set out therein, and in his treatment of the counsel for the defendant. This situation would not probably occur on another trial of the case, and, therefore, it is unnecessary for us to discuss the question here presented further.

Bill of exceptions No. 17 complains of the "action of the court in sustaining the objection by the State to the defendant's proving by the witness Dr. Holton that a few minutes before the homicide the defendant left Dr. Holton's office in the town of Prairie Hill in his buggy, and that, at that time the defendant told the doctor that he was going to Kirk, the other evidence having shown that the homicide occurred in the edge of the town of Prairie Hill, and on the road to Kirk." This evidence was offered by way of explanation as to why the defendant happened to be at the place where the homicide occurred at the time of the occurrence. Said bill further complains that after the court had sustained the objection of the State to this testimony, State's counsel, after cross-examining the witness, stated to the court in the presence of the jury, that they would withdraw their objection to the introduction of the testimony referred to in this bill. The court announced that the record would show that said exception was withdrawn. This testimony was admissible as contended for by the defendant, and the court should not have excluded the same, and ordinarily when the court, after having excluded testimony for the defendant, subsequently admits the same, there would be no error in the action of the court, but it appears from this record that the court changed his ruling so many times upon so many different questions, and in each instance after the State had gotten the full benefit of everything that they desired to accomplish by reason of the ruling of the court that we can not say that the action of the court in this respect cured the error in excluding the testimony in the first instance. It should have gone to the jury free from any ruling of the court to the effect that the same was not legal testimony.

Bill of exceptions No. 18 complains of the action of the court in regard to matters that will probably not occur upon another trial, and will not be discussed further.

Bill of exceptions No. 19 complains of the action of the court in permitting the State's counsel to ask Dr. Holton if he had not testified on application for habeas corpus to facts that were beneficial to the defendant. We hold that there was no error in the action of the court in this respect.

Bill of exceptions No. 20 clearly presents the action of the court and counsel for the State in conducting the trial of the case in such a way and in admitting testimony that was afterwards announced by them to be error, which error the court attempted to cure by with-

drawing the same from the consideration of the jury in instructing them not to consider the same for any purpose whatsoever that we deem it proper to set out this bill of exceptions in full:

"State of Texas                In the District Court of Ellis
        v.           No. 15866    County, Texas, February Term,
R. W. Kemper.                     A. D. 1910.

"Be it remembered that upon the trial of the above entitled and numbered cause, while the defendant's witness, Dr. Holton, was on the stand, after he had testified to matters highly material to the defendant, he being an eyewitness to the homicide, and having among other things testified to facts which if believed to be true would entitle the defendant to be acquitted, and after said witness had testified on cross-examination in effect that his only object was to tell the truth, the State was permitted, over the defendant's objection, to ask the following questions and elicit the following answers: 'Q. Aren't you actuated by another motive also? A. I am unaware of it if I am. Q. Well, you have been unfortunate enough to kill your man, haven't you? A. I certainly have; yes, sir. Q. You were ready to draw your gun on old man Persons, and in two weeks before the killing you drew your gun on a third man? A. No, sir; I deny any such statement. Q. You are known to be handy with your gun, aren't you? A. I never used but one in shooting at a person in my life. I used that one fairly handy when I had it to do. That was a shotgun, too, Mr. Thomas; it wasn't a pistol. Q. The same sort of gun that Kemper had when he killed his man? A. Yes, sir.'

"To which said questions and answers the defendant then and there objected upon the ground that it was an improper attack upon the witness for the purpose of discrediting his testimony before the jury, highly prejudicial and not confined to the witness being legally charged with any offense of the grade of felony, or involving moral turpitude, which said objections were by the court overruled, and said evidence admitted, as shown, and to which defendant then and there, for the reasons stated, excepted.

"It is here recited as a fact that after the testimony had been closed and three of the four speeches made for the State had been delivered to the jury, and during the progress of the third speech for the defendant, and after several days had elapsed, and after all of the counsel who had addressed the jury up to the time stated had commented on the character of this witness, State's counsel, in substance contending that the evidence showed they naturally sympathized with the defendant and would, therefore, do anything to help him out, and defendant's counsel answering this argument as best they could, the court finally at the time stated, and while said third counsel for defense was addressing the jury, stopped counsel and instructed the jury that the court had determined that this testimony as to Dr. Holton and others of defendant's witnesses having been in shooting scrapes or having

killed other persons would not and must not be considered by them
for any purpose, nor would they allow it in any way to affect the
consideration of this case nor their verdict, and later on during the
progress of the argument on one or two other occasions instructed the
jury that they must not consider this testimony nor the comments
and arguments of counsel thereon.

"To the exclusion of which said testimony, as above stated, and the
conduct and actions of the court, as set out, the defendant in open
court excepted, for the reasons stated, and here now tenders this his
bill of exceptions, as above set out, and asks that the same be allowed,
approved, ordered filed and made a part of the record in this case, as
defendant's bill of exceptions No. 20, which is accordingly done.
Will Hancock, of counsel for defendant.

"This bill complaining of the court's permitting the State to show
that the witness Holton had been unfortunate enough to kill a man,
is qualified by the following explanation:  On redirect examination by
his counsel, he testified that his father had been shot down by two men
when he, Holton, who knew nothing of the beginning of the difficulty,
arrived upon the scene and said two men were beginning their assault
and threatening further violence to his father when said witness was
handed a gun by his sister and shot and killed one of said men, and
that he was never indicted therefor.  July 11, 1910.  W. C. Wear,
Judge."

We hold that the action of the court in permitting the prosecution
to proceed in the manner pointed out in this bill of exceptions was
highly prejudicial to the rights of the accused and that the same is
not supported by any rule of practice known to our jurisprudence.
This bill and similar bills of exception which the court has certified
to be correct shows a reckless disregard of the rights of the accused
by the State's prosecuting officer in this case, although the court at
the winding up of a long and tedious trial undertook to withdraw
from the consideration of the jury the admission of certain testimony
which occurred to his mind as being damaging to the defendant,
which action of the court was not objected to by the State's counsel.
We presume that the State's counsel did not object for the reason
that they relied upon the principle announced by the private pros-
ecutor, as shown by the record, in discussing the question involved
in this exception, to wit: the admission of testimony and the with-
drawal of the same thereafter and the effect of such withdrawal, the
record shows the following:  While the court was considering the
advisability of certain testimony, and after he had instructed the jury
not to consider the same, the counsel for the State, in addressing
the court in regard to its action in excluding the testimony to the
effect that it was useless to withdraw the same, said, "On the principle
that that which is once in can not be withdrawn."  If this principle

had been recognized and observed at the beginning of this trial and throughout the same, it is apparent that many of the errors complained of in this record would not have been committed, and the able prosecuting counsel who recognized this rule so clearly, should not have produced the occasion which caused the court to commit the errors complained of, nor bring about a condition whereby it became necessary for the court to undertake to do the thing which the prosecuting officer recognized in the declaration of this principle the court was powerless to do. And the rule in reference to the action of the court in this respect is so well settled in the light of decisions heretofore pointed out in this opinion that it is not necessary for us to again repeat it, but we call attention of the trial courts of this State to this rule, and urge them to observe the rule, for it is useless for the State to proceed in the trial of cases in total disregard of the well recognized rulings of the court upon questions that are so clearly settled and thereby bring about the necessity of a reversal of a cause, the trial of which has involved the cost to the State of large sums of money, and the expenditure of much time and much labor on the part of all who have participated in the trial. In this connection we think it proper to quote the language of the Assistant Attorney-General in his brief wherein he says: "So long as the State commits such errors as this, she does so at her own peril for certain it is that this court created as it was for the sole purpose of hearing the appeals of those who believe they have not had a fair legal trial by the courts, will not tolerate such violation of the rules of evidence as is shown in this instance."

Bill of exceptions No. 21 presents no error. Bill of exceptions No. 22 complains of the action of the court in commenting upon such testimony referred to therein. We think the complaint as to the comment of the court is not without merit. The statute of the State requires the court to rule upon the admissibility of testimony, but prohibits him from expressing any opinion as to the weight which should be given to such testimony, and this bill shows that the court clearly indicated to the jury that this testimony was of no value. We think the court should have adhered to his ruling when he excluded the testimony on the ground that the same was inadmissible and should not have permitted the same to have gone to the jury at all, but if he did permit it to go to the jury he should have permitted it to go without any comment from him. It is the duty of the court to see that the testimony which is introduced in evidence is legal testimony, and competent testimony, and it is not necessary for either the State or the defendant to object to the testimony in order that the court may exclude it. He may do so of his own motion, if it is clear that the testimony is not admissible for any reason. This error, however, is not of sufficient importance to require a reversal of the case.

Bill of exceptions No. 23 presents in our opinion no error. This

evidence was admissible, the bill showing that the other evidence in the case disclosed that the defendant Kemper at the time of this conversation was discussing the deceased.

Bill of exceptions No. 24 complains of the "action of the court in permitting the State's counsel to ask defendant while he was upon the stand if the defendant had not been indicted for illegally taking money from negroes." The court should not have permitted counsel to lug into this case any evidence pertaining to the charge of illegally obtaining money from other persons on the part of the defendant; even if it was true, it would not be a material inquiry in determining the issues between the State and defendant upon a charge of murder, and it could only serve the purpose of prejudicing the jury against the defendant, and while it was proper for the State to have shown that Persons was the man, or one of the men, who was endeavoring to have the defendant indicted, it having also appeared from the record that these people were the ones that the defendant had complained of, yet the State should be required to separate that which is legal from that which is illegal, and use that which is legal and leave off that which is illegal.

Bill of exceptions No. 25 complains of the "action of the court in permitting the State's counsel to ask the defendant while he was upon the stand as to what the deceased witness had testified to at the habeas corpus trial, and if he, defendant, did not wait till after said witness was dead to deny a statement, which the State claimed had been testified to by the deceased witness in a habeas corpus trial. This was error. It was immaterial upon the trial of this case what the witness Stovall testified to before the habeas corpus trial. That is, except for the purpose of reproducing to the jury the testimony of such deceased witness, and reproduction can not be had in that way. And if after the State had introduced the testimony of such witness and the defendant had testified to facts denying the truth of the statement of said witness the State of course could show when the defendant first denied these statements, but it would not be proper for him to show that fact in the manner undertaken in this instance as shown by this bill of exceptions, and in view of our holding in this opinion as to the introduction of the testimony of the witness Stovall, who was deceased at the time of this trial, the error complained of herein will not occur upon another trial of the case and we will not discuss the same further.

Bill of exceptions No. 26 complains of the action of the court in permitting the State's counsel, over the objection of the defendant, to ask the defendant's witness, Cas Lansford, while upon the stand, if he had not been previous to that time indicted for assaults upon other persons, and if he was not a saloon keeper, and if he had not been indicted for violating the Sunday law. The court explains the bill by stating that "all of this testimony was withdrawn from the consideration of the jury, and the jury was instructed not to con-

sider the same for any purpose." We think that that portion of the bill which shows that counsel was permitted to ask the witness if, as a saloon keeper, he had not violated the Sunday law, was improper, and should have not been permitted. However, the error is not such as would of itself reverse the case, nor would it be sufficient cause to set aside the verdict of the jury. What we have said heretofore with reference to this character of testimony, and the effort of the court to withdraw it from the jury instructing them not to consider the same applies with equal force to this part of this bill.

Bill of exceptions No. 27 complains of the "action of the court in permitting the State's counsel, upon cross-examination to ask the witness, Wiley Sims, if he had not been indicted for the offense of sand packing cotton, and the witness answered that he had been indicted for swindling in selling sand packed cotton." We do not think there was any error in the admission of this testimony. The defendant and the witness had the right, if they so desired, to explain to the jury the circumstances attending this charge against the witness.

Bill of exceptions No. 29 complains of the "action of the court in permitting the State to show by the witness, Tom Moody, certain statements which the defendant is alleged to have made to the witness on the occasion mentioned in the bill of exceptions, the objection being that no proper predicate had been laid for this testimony."

We do not agree to this contention and think the predicate was properly shown, but the witness should have been asked the direct question, and in the exact language of the predicate. The error committed was in permitting the witness to state the conversation between himself and the defendant, whereas it should have been confined in substance to the language of the predicate which the defendant had denied having used.

Bill of exceptions No. 31 complains of the language used by the private prosecutor in his closing speech to the jury, which language is set out in bill of exceptions. The court, however, in approving this bill says that the same was in answer to argument which had previously been made to the jury by the counsel for the defense. This bill of exceptions as explained by the court presents no error in our opinion.

Bill of exceptions No. 32 complains of the action of the private prosecutor in his closing argument to the jury in using this language: "I now invite them (meaning counsel for the defendant) to get Mrs. Persons to take this stand, and let them ask her the question, where her son's pistol was when he lost his life." It appears from the record that Mrs. Persons, the mother of the deceased, was eighty years of age, and was carried to the courthouse and placed upon the witness stand in this case by the State. She testified to the fact that she was eighty years of age, and was the mother of the deceased; that she was living in his house at the time of his death and had

been living with him about three years; that she went there before his wife's death, and was there when she died, and remained there until it [he] was taken from her; that she knew positively that she never made any special pockets in the inside of his coat, and knew that his wife never made any; that she knew that there was never any such a pocket made to his coat." The court states in his explanation of this bill "that defendant's counsel declined to cross-examine Mrs. Persons; yet in argument criticised counsel for State for not questioning her as to whereabouts of her son's pistol, and then argues that Mrs. Persons' testimony as to pistol would have shown Persons armed on day of killing. The challenge was in direct reply to defendant's argument."

The bill of exceptions states that the private prosecutor after all the argument had been made in behalf of defendant, and in his closing speech used this challenge in a "tragic and actor-like manner," and in a "sensational and daring-like" manner. If it was permissible for the counsel for the prosecution to have issued this challenge, it would have been permissible for him to assume any attitude he chose. However, we hold it to be improper for a prosecuting officer in the closing argument to challenge the defendant's counsel to bring a State's witness upon the stand for the purpose of developing evidence which both parties had an opportunity to develop before, and which both of them declined to develop. But while holding this, we also hold that the defendant's counsel can not say in his argument to the jury that the testimony of this witness would have shown the deceased to have been armed at the time he was killed, and then deny to the State the right to let the witness testify upon the question. Such a rule would manifestly be unfair to the State and would give the defendant an undue advantage. Therefore, we hold that in this particular instance the court did not err in refusing to exclude from the jury the arguments of the prosecuting officer.

Bill of exceptions No. 33 complains of the remarks of the private counsel for prosecution in his closing argument to the jury. Inasmuch as this case has to be reversed, and that the matters complained of in this bill will probably not occur again we deem it unnecessary to discuss this bill further.

Bill of exceptions No. 34 complains of the "action of the court in not allowing the defendant to prove, after the State had shown by the witness that the reputation of the deceased as a peaceable and law-abiding citizen was good, that the same witness had heard in the community in which the deceased lived that the deceased was accused of burning a barn which was the property of one Ed Summers. The court of his own motion declined to permit the defendant to show this fact." Article 713 of the Penal Code provides that when a defendant seeks to justify the killing of another on account of threats made against him by the deceased, he may show the general reputation of the deceased as to whether or not he is a man

who would likely carry into execution a threat made, but nothing further in the way of reputation can be produced. Therefore, we hold that the court committed no error as shown by this bill.

Bill of exceptions No. 36 shows "that after the witness, Tyne Smith, a material witness for the defendant, had testified to the effect that the deceased had told him just a few days before the killing that if the defendant was elected it would do him no good, that he, Persons, would kill the defendant before he should hold the office for which he was running," the court permitted counsel for the State to introduce certain portions of this witness' testimony on the habeas corpus trial relative to this subject, in which testimony he had detailed the conversation referred to by him with the deceased, but did not state that the deceased had told him that before the defendant should hold the office he, deceased, would kill him. This testimony was offered over the objection of the defendant, after which the defendant offered in evidence the entire testimony of said witness at said habeas corpus trial. The witness further on in his testimony on discussing the same conversation, when he was pressed to use the same language which the deceased used to the witness about the defendant, the witness testified that, "As near as I can remember (meaning deceased) he said he (meaning defendant) was the damdest dog in that country, and before he should have that office he would kill him; that the deceased had said that one Dr. Holton had gotten the drop on him in a row, but that he would not get it any more, and he (meaning deceased) said that the first time that he got the drop on Kemper he was going to kill him; that this witness imparted this conversation to defendant on the 8th day of July, which was the day previous to the homicide." It was error in the court, after it had permitted the State's counsel to introduce the testimony of the witness, Tyne Smith, upon the habeas corpus trial for the purpose of impeaching said witness, and this was the only purpose for which such testimony could have been admissible, to then refuse to permit the defendant to introduce to the jury the remaining portion of his testimony relating to the same subject matter, and which explained, or pretended to explain, the testimony which had been offered by the State, and the action of the court in this respect was prejudicial to the defendant, and constitutes a reversible error. The rule is well settled that when a portion of a statement of a witness is used by either party to impeach the witness or to contradict him in any manner, it is proper for the other party to use the testimony of the witness delivered at the same time and relating to the same subject matter which explains or pretends to explain to the jury fully the testimony of the witness so that his testimony upon the subject up for consideration can be fully understood by the jury, and in order that the witness may not be placed in an improper light before the jury, whose duty it is to pass upon the truthfulness of his testimony. Any other rule than this would fall far short of

justice either to the witness or to the defendant, and the rule is so well settled that it is not necessary for us to cite authorities to support it.

Bill of exceptions No. 39 complains of the refusal of the court to give the defendant's special charge, as follows: "You are instructed as a part of the law of this case that if the defendant believed the deceased was armed and had any reasonable ground for such belief, then the defendant would have the right in law to act upon such belief, even though you find that deceased was not in fact armed."

The court in approving this bill states: "That the refused charge is covered in the main charge." We have examined the main charge and we have failed to find anything in that charge which covers the point presented in this special charge. It is contended by the Assistant Attorney-General that this charge is covered by paragraph 21 of the court's charge, which paragraph is as follows: "In this connection you are charged that if before the killing the defendant had been informed that the deceased had made threats to take his life or to do him some serious bodily harm, and as to whether the defendant had received such information is a question for you to determine, and that at the time of the difficulty which resulted in the killing of the said B. D. Persons, the said B. D. Persons, by his act or acts or manner, caused the defendant to believe that he, the said Persons, intended to put the threat or threats so communicated to the defendant, into execution, and that the defendant believed or had reason to believe that the deceased was about to put said threat or threats into execution, or if you have a reasonable doubt as to said matters, then you will acquit the defendant."

We do not think that this charge covers the point presented by the special requested charge. We think the requested charge should have been given.

We have disposed of all of the bills of exception and all of the issues presented in this record except the one presented by bill of exceptions No. 30. It is apparent from what has been said already that this case must be reversed and remanded for another trial; we could, therefore, decline to decide the constitutional question raised by this exception. But inasmuch as this is a question which is likely to arise at any time in any case, and one which seems to be at this time unsettled in this State, we feel that it is our duty to declare what we conceive the law to be with reference to this issue.

Appellant, as a preliminary step to the trial of this case, filed a plea to the jurisdiction of the court in which it was alleged that the court in Limestone County, who changed the venue to Ellis County, on his own motion, acted without authority of law, and therefore jurisdiction did not attach to Ellis County. Replying to this contention it is sufficient to say that even though the contention of appellant be correct, he is in no position to take advantage of that situation because the record shows that he was present both in person

and by counsel at the time the order was entered changing the venue from Limestone to Ellis County, and made no objection to the proceeding nor to the order of the court. If he desired to protest against the action of the court in this respect he should have done so at that time, and not have waited until after the court assigned his reasons and made his order, and the State had called him to the bar to answer the charge in such other jurisdiction.

Therefore, we hold that there was no error in the trial court overruling appellant's plea to the jurisdiction of the court.

Bill of exceptions No. 30 complains of the action of the court in permitting the State to show by one Chas. I. Evans, Jr., "that he was a shorthand reporter, stenographer and typewriter, residing in Dallas, Texas, and official reporter of the Criminal District Court of Dallas County, Texas; that he was called on to report the testimony in the habeas corpus trial of Bob Kemper at Groesbeck, Texas, being employed by the attorneys for the State; that he took down the testimony of all the witnesses in shorthand, and afterwards transcribed his shorthand notes on the typewriter in person; that he held in his hand while testifying his typewritten statement of the testimony taken at said habeas corpus trial, which included the original testimony of the witness, J. G. Stovall; that he had correctly taken down said testimony, and correctly written out his shorthand notes, and that the same was a correct reproduction of the testimony of said witness; and said statement of said Stovall's testimony showed that J. G. Stovall was sworn at the time he gave his testimony at said habeas corpus trial, but there is no other testimony that said Stovall was in fact sworn; said Evans testified that said record was correct and it was shown that said Stovall was dead at the time of this trial, whereupon the State then offered in evidence the testimony of the said J. G. Stovall, deceased, as taken down by the said stenographer as above stated, to which the defendant objected, first, because it would be violative of the defendant's rights under the Federal Constitution, which guarantees that the defendant shall be confronted with the witness; second, it is violative of the defendant's rights under the State Constitution, in that he is not confronted with the witness; third, it is hearsay; fourth, that it purports to be a record of the habeas corpus trial for bail and not a former trial of this case nor an examining trial; fifth, that it is not shown that the stenographer who took it was sworn at the time of the trial; sixth, because this statement was taken down by a stenographer employed by the private prosecution of this case and not by an official stenographer appointed by the court; seventh, that said testimony was not taken by any person authorized by the court, nor any officer of the court authorized by the laws of this State.

The question to be determined, arising upon this exception, is one that has frequently been before this court and courts of other States, and occasionally before the Supreme Court of the United States.

It involves the meaning of a constitutional guaranty to a citizen of the sovereign State of Texas. It also involves the consideration of the effect of the Bill of Rights which has been written into our Constitution. It also involves the validity of the statute passed relating to the admission of testimony reduced to writing in an examining trial after the witness dies or leaves the State and his testimony given upon the examining trial is offered before the court and jury against the accused upon a final trial when the defendant is arraigned upon a bill of indictment.

The decisions of this court, from the Greenwood case, 35 Texas, 587, down to the Cline case in 36 Criminal Appeals Reports, page 320, announce the rule that testimony taken in an examining trial, as prescribed by article 288 in the Code of Criminal Procedure, can be introduced against an accused person upon a subsequent trial upon an indictment, where it is shown that the witness is dead at the time of the offering of the testimony, notwithstanding the guaranty of the Bill of Rights as incorporated in our Constitution.

The Cline case, supra, for the first time challenged the correctness of these decisions, and declared with great force the contrary rule, a majority of the court rendering the opinion, Judge Henderson dissenting. The rule announced in the Cline case was recognized and followed until the decision in the Porch case in the 51 Texas Criminal Reports, page 7, at which time the personnel of the court had changed, Judge Brooks succeeding the late Judge Hurt. In the Porch case Judge Brooks agreed with the opinion of Judge Henderson and the court overruled the Cline case, Judge Davidson dissenting.

Again, in the Hobbs case, 53 Texas Crim. Rep., 71, the personnel of the court again having changed, Judge Henderson having left the court, Judge Ramsey succeeded him, the court, through Judge Ramsey, announced the decision in that case, and again adhered to the rule announced in the dissenting opinion of Judge Henderson in the Cline case and affirmed the doctrine established in the Porch case. This opinion of the court was dissented from by Presiding Judge Davidson, who delivered the opinion of the court in the Cline case.

The Hobbs case was again followed in the Pratt case, 53 Texas Crim. Rep., 281, 109 S. W. Rep., 138, the court being constituted the same as when the opinion in the Hobbs case was delivered, Judge Davidson again dissenting.

In order that we may have clearly before us the proposition, we will quote that portion of the Bill of Rights applicable, set forth in the Constitution of the State of Texas of 1876:

"Section 10. In all criminal prosecutions the accused shall have a speedy, public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself

or counsel, or both; shall be confronted with the witnesses against him, and shall have compulsory process for obtaining witnesses in his favor, and no person shall be held to answer for a *criminal offense, unless on indictment of a grand jury,* except in cases in which the punishment is by fine or imprisonment otherwise than in the penitentiary, in cases of impeachment, and in cases arising in the army or navy, or in the militia when in actual service in time of war or public danger."

Section 29 of the Bill of Rights, referring to the guarantees set forth therein, is as follows: "To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void."

Article 24, Code of Criminal Procedure, provides: "The defendant upon a trial shall be confronted with the witnesses, except in certain cases provided for in this Code where depositions have been taken."

Article 288, Code of Criminal Procedure, relating to the examination of an accused person before a committing magistrate, provides: "The testimony of each witness examined shall be reduced to writing by the magistrate, or someone under his direction, and shall then be read over to the witness, or he may read it over himself, and such corrections shall be made in the same as the witness may direct, and he shall then sign the same by affixing thereto his name or mark. All the testimony thus taken shall be certified to by the magistrate taking the same."

Article 797, Code of Criminal Procedure, provides: "When an examination takes place in a criminal action before a magistrate the defendant may have the deposition of any witness taken by any officer or officers hereafter named in this chapter; but the State or person prosecuting shall have the right to cross-examine the witnesses, and the defendant shall not use the deposition for any purpose unless he first consent that the entire evidence or statement of the witness may be used against him by the State on the trial of the case."

Article 798, Code of Criminal Procedure, provides: "Depositions of witnesses may also, at the request of defendant, be taken in the following cases: *First,* when the witness resides out of the State. *Second,* when the witness is aged or infirm."

Article 811 of the Code of Criminal Procedure provides: "Depositions taken in the examining court shall be sealed up and delivered by the officer or officers, or one of them, to the clerk of the court of the county having jurisdiction to try the offense; and in all other cases the return of depositions may be made as provided for depositions in civil actions."

Article 812, Code of Criminal Procedure, provides: "Depositions taken in criminal actions shall not be read unless oath be made that

the witness resides out of the State, or that since his deposition was taken the witness had died; or that he has removed beyond the limits of the State, or that he has been prevented from attending court through the act or agency of the defendant, or by the act or agency of any person whose object was to deprive the defendant of the benefit of the testimony, or that by reason of age or bodily infirmity such witness can not attend."

Article 814, Code of Criminal Procedure, provides: "The deposition of a witness taken before an examining court or a jury of inquest, and reduced to writing and certified according to law, in cases where the defendant was present when such testimony was taken and had the privilege afforded him of cross-examining the witness, may be read in evidence as is provided in the two preceding articles for the reading in evidence of depositions."

Webster defines the word "confront" to mean: First, "to stand facing, or in front of; to face, especially to face hostilely; to oppose with firmness." Second, "to put face to face; to face; or to meet; as to 'confront' one with proofs of his wrongdoing."

Bouvier's Law Dictionary defines "confrontation" in criminal law to mean: "The act by which a witness is brought in the presence of the accused, so that the latter may object to him if he can and the former may know and identify the accused and maintain the truth in his presence. No man can be a witness unless confronted with the accused, except by consent."

In Anderson's Law Dictionary, page 226, the following definition is given: "Confront: To bring face to face. The constitutional provision that the accused shall be confronted with the witnesses against him means that the witnesses on the part of the State shall be personally present when the accused is on trial, or that they shall be examined in his presence and be subject to cross-examination by him."

Criminal prosecution has been held to mean: "The mode of the formal accusation of offenders. (Burnap v. Marsh, 13 Ill., 535; Donnelly v. People, 11 Ill., 552, 52 Am. Dec., 459.)

"The means adopted to bring a supposed offender to justice and punishment by due course of law." (People v. Bowles, 70 Kans., 821, 69 L. R. A., 176; Schultz v. Keokuk, 74 Iowa, 292, 37 N. W., 376; Sigsbee v. State, 43 Fla., 524, 30 So., 816.)

"A criminal proceeding at the suit of the government." (Ex parte Fagg, 38 Texas Crim. Rep., 573.)

"The whole or any part of the procedure which the law provides for bringing the offenders to justice; a criminal action; a proceeding constituted to carry on by due course of law before a competent tribunal, for the purpose of determining the guilt or innocence of a person charged with crime." (Black's Law Dictionary, quoted in State v. Rozum, 8 N. D., 548, 80 N. W., 477.)

"The process of exhibiting formal charges against an offender

before a legal tribunal, and pursuing them to final judgment on behalf of the State or government, as by indictment or information." (State v. Bowles, 70 Kans., 821, 79 Pac., 726, 69 L. R. A., 176; Burrill's Law Dictionary, quoted in Corbin v. People, 62 Ill. App., 355; Shultz v. Keokuk County, 74 Iowa, 292, 37 N. W., 376; Webster's Dictionary quoted in Territory v. Nelson, 2 Wyo., 346 to 352.)

For the purpose of determining the meaning of a Constitution or a Bill of Rights, one of the rules deduced from all of the text writers upon the subject, as well as the decisions of the courts, is, "To ascertain the meaning of the Constitution the first resort in all cases is to the natural signification of the words used, in the order and grammatical arrangement in which the framers have placed them; and if thus regarded, the words used convey a definite meaning, which involves no absurdity and no contradiction between the parts of the same writing, then the meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed, and this meaning when so ascertained must be taken as the authoritative rule. There is no occasion for construction in such cases and it is not allowable."

This rule is announced by the courts of the following States: Illinois, Indiana, Maryland, Minnesota, Mississippi, New York, Wyoming, Alabama, California, Georgia, Iowa, Kentucky, Louisiana, Maine, Michigan, Nevada, New Jersey, Texas. And the same rule has been declared by the Supreme Court of the United States on numerous occasions. See Gibbons v. Ogden, 9 Wheat. (U. S.), 6; the Paulina v. U. S., 7 Cranch (U. S.), 52, 3 L. Ed., 266, and see also Cooley on Constitutional Construction, and Cyc., vol. 8, page 732.

Having thus set forth the provisions of the Constitution and Bill of Rights relating to the subject under consideration, and the articles of the Code of Criminal Procedure relative thereto, and having ascertained the true rule of construction, as applicable to Constitutions, we are prepared to enter upon the consideration of the question at hand. To our mind there can be but one answer to the question here presented, and that is, that the testimony of a witness taken in an examining trial, or in a habeas corpus proceeding, or in any other preliminary investigation, where the witness, subsequent to giving the testimony, but before trial of the accused upon indictment, dies or removes from the jurisdiction of the State, without any responsibility therefor being chargeable against the accused, is not admissible against the defendant in a trial of the defendant upon indictment for a felony, no matter how the testimony may have been taken and preserved. And the fact that the defendant was present at such examining trial or other preliminary investigation, and was afforded an opportunity to and did cross-examine the witness, would not affect the rule.

What was the purpose to be served uppermost in the minds of the

framers of the Constitution and the Bill of Rights when they declared: "That in all criminal prosecutions the accused shall have a speedy, public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel or both; shall be confronted with the witnesses against him and shall have compulsory process for obtaining witnesses in his favor, and no person shall be held to answer for a criminal offense unless on indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment otherwise than in the penitentiary, in cases of impeachment," etc.? As preliminary to answering this question let us ask and answer some others.

What kind of a prosecution was this to be? A criminal prosecution. Who were to be the triers in this criminal prosecution? An impartial jury. What kind of a trial was this to be? A public trial. When was this trial to take place? In no case until an indictment of the grand jury, that is, for an offense of the grade with which the defendant is charged in this case, namely, murder.

Therefore, the framers of the Constitution could not have had in mind an examining court, a habeas corpus trial, nor any other proceeding preliminary to the trial in which the guilt or the innocence of the accused was to be determined by the jury impaneled for the sole purpose of determining his guilt or innocence, and in that trial, on that occasion, and under those circumstances the accused person, whoever he may be, and with whatever offense he may be charged, shall be "confronted" with the witnesses against him. How is he to be "confronted?" Surely, by having them come face to face.

Some who have written upon this subject have declared that the purpose which the framers of the Constitution had in mind when they wrote this provision was the right of the accused to look upon the witness and to cross-examine him. We freely concede that that was one of the purposes which the framers had in mind, but there was another, to our mind, far more important, namely: That the jury, whose sole province it is to determine the guilt or innocence of the defendant, should have the opportunity of looking upon the witness and observing his demeanor on the stand while giving his testimony, they having the sole right and power to determine the weight to be given to the witnesses' testimony and the credibility to be given to the witness.

How can a jury determine the weight to be given the testimony of a witness, or the degree of credit he is entitled to have when they have never seen him or heard him or observed him in any manner? It is clear to our minds as to any number of witnesses whose testimony is reduced to writing and presented to a jury who know nothing of the witnesses, have never seen nor observed them, that jury can have no rule for determining the weight to be given their testimony

or the credit to which they are entitled; and yet this authority placed in the hands of a jury is the most important and the most valuable right which a defendant can possibly have in a criminal trial. The most notorious character, the most monumental liar, the most reckless character with the truth can testify, notwithstanding he may be cross-examined, and have his statement reduced to writing, and that statement will be, when read, just as convincing and perhaps just as intelligent and carry with it just as much weight and command just as much credit as the written statement of a man who is entirely opposite to him in every respect, with a jury composed of men who never saw either one of them, never heard either one of them, and therefore had no opportunity to observe them as to the manner in which they delivered their testimony. To our mind, this opportunity of the jury to see and hear a witness and to observe his manner of giving his testimony and to observe his demeanor upon cross-examination, was the primary and supreme purpose which the framers of the Constitution had in mind when they declared that the accused person had the right to be "confronted with the witnesses against him in all criminal prosecutions."

Our Creator, in His wisdom, has stamped every man with a countenance upon which is reflected the heart, whether true or false, and few there are, when put to the test, whose countenance will fail to reveal to the minds of their observers the truth, as they believe it to be. How often is it the case that we hear the highest courts in the land declaring that they will not disturb the verdict of a jury in their finding of facts, nor the action of the trial judge in refusing to do so, for the reason that they "saw and heard the witnesses, observed their demeanor upon the stand, and therefore were in a better position to judge of the weight to be given to the testimony, and the degree of credit to be given the witnesses, than the Appellate Court, having before them only the record of what transpired."

It was declared by the Supreme Court of the United States in the very decision referred to in the opinions in the Porch and Hobbs cases, wherein the court overrules the Cline case, that "it was the prime object of the constitutional provision in question to prevent depositions or ex parte affidavits, such as are sometimes admitted in civil cases, being used against the defendant in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity not only of testing the recollection and sifting the conscience of the witness, but to *compel him to stand face to face with the jury in order that they may look at him and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.*"

And the same eminent tribunal recognizes this as a valuable right to the accused, for in the same paragraph and following immediately after the above quotation, it is said: "There is doubtless reason for

saying that the accused should never lose the benefit of any of these safeguards, even by the death of the witness."

What "safeguard" was the court talking about? Certainly, the one mentioned by it when it says: "That the witness shall stand face to face with the jury in order that they may look at him and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." And "that if notes of his testimony are permitted to be read he is deprived of the advantage of that personal presence of the witness before the jury which the law has *designated* for his *protection.*"

What was designed? The personal presence of the witness before the jury. What does this eminent court say this was for? For his protection. For whose protection? The accused. Mattox v. U. S., vol. 156, p. 237.

It is clear, therefore, and beyond any cavil, that when we look to the plain import of the plain and simple language set forth in section 10 of the Bill of Rights in the Constitution of the State of Texas, the accused for his "protection" is "safeguarded" in the right that when he is arraigned before the courts of the country upon a bill of indictment for felony, and he has pleaded not guilty to the charge, and the jury has been selected to determine his guilt or his innocence and decide the issue between him and the State, the government shall be required to confront him with the witnesses by whose testimony it proposes to condemn him.

The opinion of the majority of the court upon this question as announced in the Cline case is so clear and so strong and so convincing and so full of reason and logic that no court since that time which has ever had occasion to discuss it, or refer to it in any manner has ever undertaken to answer it.

The decisions referred to, from the Greenwood case in the 35 Texas, and cited by Judge Henderson in his dissenting opinion, on down to the opinion delivered in the Cline case, rest their decision upon "the necessities of the occasion," or "the necessities of the case." While they do not say in express terms that the language of the Constitution does not admit of any other construction than that which its plain language imports, yet the opinion in each case clearly demonstrates that the court construed this language to mean that in every case where the defendant is arraigned upon a bill of indictment he must be confronted with the witnesses against him, because these decisions declare that the Code of Criminal Procedure, which authorizes the admission of testimony in the trial of an accused person, where his testimony has previously been reduced to writing in an examining court, properly signed and certified to and it conclusively appears that the witness has subsequently died, is an "innovation" upon the Constitution.

Now as to the ordinary definition of the word "innovate," we find that Webster says: "Innovate" means "to change or alter, by in-

troducing something new; to remodel; to revolutionize." "Innovation" means: "change effected by innovating; a change in customs, something new; and contrary to established customs, manners or rights."

Think of it! The court "innovating" upon the Constitution, and by that "innovation'" depriving a citizen of a valuable right. The question arises, where does the court get the authority to "innovate" upon the Constitution? Who clothed it with the power to "innovate" upon the Constitution or the Bill of Rights? The pages of the Constitution may be searched from "headline to footnote," and not one word can be found in all the lines of that sacred document that will permit any court to "innovate" upon its plain language. It would be as reasonable for one to undertake to "innovate" upon the Bible, or to change the plan of salvation, or to destroy the Ten Commandments, as for any court of any country which recognizes the Constitution as the supreme law of the land to undertake to "innovate" upon, to change, to alter, to revolutionize, or place something new in, or to reform, remodel, or reconstruct the Constitution by judicial construction. And in this connection we call attention to the fact that it must have appeared to the minds of the framers of the Constitution that some court some day might undertake to "innovate upon, remodel, modify, change, alter, reconstruct or revolutionize" some provision of the Bill of Rights, because in the very last section of the Bill of Rights, section 29, after having set forth all of the guarantees safeguarding the rights of the citizen, protecting him from the high power of those who were exercising authority over him, they used this remarkable and forceful language: "To guard against transgressions of the high powers herein delegated we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto or to the following provisions shall be void." Listen to it! Could language be stronger? Could words be simpler and clearer of meaning? Could the purpose of those who framed the Bill of Rights have been more clearly and unmistakably set forth than set forth in this section? "The powers herein delegated" means the power of the Legislature, the Executive and the Judiciary. What power has the Legislature to alter, modify, or change the Constitution, anyway? None; absolutely none. What power has the executive department to do so? What power has the court to do so? "To guard against transgressions of the high powers herein delegated we declare that everything in this 'Bill of Rights' (which includes section 10, which provides that the accused shall be confronted with the witnesses against him) is excepted out of the general powers of government." Then if it is excepted out of the general powers of the government, how can the government, acting through its agencies, deprive the citizen of this right, however great the necessity may be? "And this right shall forever remain invio-

late." No authority shall ever invade these rights. They shall not be violated. "And all laws contrary thereto." Contrary to what? To the guarantees set forth in the twenty-eight preceding sections. Certainly, if the Legislature by an Act should undertake to destroy any right guaranteed to the accused in this Bill of Rights, under this clause that Act would be void. If the executive should undertake to destroy or deprive the citizen of any right guaranteed under this Bill of Rights his act would be void. If these propositions be true, then why does it not follow as equally true that a decision of a court which would in effect render nugatory this provision of the Bill of Rights, would be void? And yet, in the face of the language of this provision, as plain as it is, as emphatic as it is, as manifest as was the purpose in view, when it was written and adopted, we find that the courts in this State have set it aside, and declared that they have laid down a rule by which section 10 of the Bill of Rights has been "innovated upon, changed, altered, remodeled, reformed and revolutionized."

We do not hesitate to say that we can not follow any court, no matter how eminent, no matter how learned, when that court confesses that in order to justify its decision it must "innovate" upon the plain language of the Constitution, and violate specifically and unquestionably sections 10 and 29 of the Bill of Rights.

We next come to the dissenting opinion of Judge Henderson in the Cline case. A careful analysis of this decision shows that Judge Henderson based his ruling upon a wholly different ground from that which had been asserted by the courts previous to the Cline case. The substance of his opinion is, that inasmuch as this character of testimony was admitted under the rules of the common law as practiced in England at the time and previous thereto of the adoption of the Constitution of the United States, and the amendment thereto incorporating this safeguard, and the English Bill of Rights contained the same guarantee in effect, it must be held that when the framers of our Constitution wrote into it this clause that an accused person shall be confronted with the witnesses against him, it was intended by them that its language should receive the same construction which had previously been placed upon it in England under the common law. We quote from his opinion:

"No mention is made of this question in the Magna Charta, and it does not seem to have been one of the grievances for which King John's subjects demanded redress, unless it be included in article 39, which is as follows: 'No free man shall be taken or imprisoned or deceased or outlawed or banished or in any ways destroyed, nor will we pass upon him, nor will we send upon him unless by the lawful judgment of his peers, or by the law of the land.' However, there can be no doubt it was a part of the common law of Great Britain, that on the trial of a criminal case it was necessary to confront the

accused with the witnesses against him.    On a trial a defendant
could only be convicted of a crime upon the evidence of witnesses
for the crown, and these had to be present and confront him on the
trial.    (3 Blackstone Com., p. 373; Green's English People, page
279.)

"This rule, though it has not always been complied with, has
never been gainsaid or denied under the British Constitution, but
from time to time as questions arose rules of evidence were devel-
oped in conformity with the above.    As exceptions to the general rule
requiring witnesses to speak as to facts directly within their knowl-
edge, hearsay evidence came to be admitted in many cases, such as
matters of res gestae, declarations of co-conspirators, questions of
pedigree, dying declarations, etc.    (State v. McOblenis, 24 Mo., 409,
69 Am. Dec., 435.)

"This kind of evidence was admitted in criminal cases, and though
hearsay in character, was deposed to by witnesses before the jury,
the witness testifying, of course, confronting the defendant, and this
was allowed, notwithstanding the rule that the defendant should be
confronted with the witnesses against him.    While the rule required
the confrontation it did not propose to regulate what the witness
should testify to when it did confront the defendant.    This was regu-
lated by the rules of evidence.    And in this connection it was held
that the guarantee of confrontation was satisfied if at any time dur-
ing the prosecution the witness confronted the defendant (see Sum-
mons v. State, 5 Ohio State, 325), the rule of common law being
stated in this wise, 'If there has been a previous criminal prosecu-
tion between the same parties and the point in issue was the same,
testimony of deceased witness given on oath at the former trial is
admissible on the subsequent trial and may be proved by anyone who
heard him give the evidence.    (See 2 Russell's Crimes, page 683;
Wharton Criminal Ev., section 627.)

"To show how the matter stood at common law, I will quote from
a few of the old English cases."    And then he quotes from several
decisions and continues:    "But beyond this kind of evidence there are
also two other species which are admitted by law, the one is the dying
declarations of a person who has received a fatal blow; the other is
the examination of the prisoner and the deposition of the witnesses
that may be produced against him taken officially before a justice
of peace by virtue of a particular Act of Parliament, which author-
izes magistrates to take such examinations and directs that they shall
be returned to the court of jail delivery.    This last species of depo-
sitions, if the deponent shall die between the time of examination and
the trial of the prisoner may be substituted in the room of that viva
voce testimony which the deponent, if living, alone could give, and
is admitted of necessity as evidence of the fact.   .   .   .

"These cases show the state of the English law on this subject
since the year 1654, and how the courts of common law regarded the

rule of evidence with reference to the right of the defendant on trial to be confronted with the witnesses against him. As the British Constitution in its unwritten law contained this guarantee in every jury trial, so our government, National and State, when they came to adopt Constitutions following in the wake of the mother country, placed these provisions as one of the guarantees of a defendant in every criminal prosecution. The clause or expression came to us, as understood and defined in England, and when article 6 of the amendment to the Constitution of the United States was adopted providing 'that in all criminal prosecutions the accused shall be confronted by the witnesses against him,' the framers of the organic law were advised of the meaning of said clause with reference to the rules of evidence in regard thereto, and when the federal courts came to pass on the question they gave it the same construction as to the reproduction of the testimony of deceased witnesses as had heretofore been given to it by the English courts."

He then quotes at length from a decision of the United States Supreme Court in Mattox v. U. S., decided February 4, 1895, 15 Sup. Ct., 339, to which decision we will have occasion to refer later. He then declares that the Constitutions of Texas previous to the present Constitution, contained practically the same provisions as our present Constitution upon this subject, and inasmuch as the former decisions of this State had placed this construction upon this provision, that the Constitution when adopted in 1876, was understood to be adopted with that construction placed thereon.

In the Porch case the opinion is based upon the same proposition and same authorities as presented by Judge Henderson, in the Cline case. From that decision we quote: "But we think that the dissenting opinion and the long line of authorities of this court and an almost unbroken line of decisions of the Supreme Court throughout the American Union support the converse conclusion to the opinion of the majority in the Cline case. All of the Constitutions of this State have had a similar clause to the one now under consideration in them and under all of said Constitutions the testimony taken in an examining trial was admissible in the trial in chief where the witness was dead or had removed out of the State. Therefore, this being the rule under the first Constitution of this State, and each succeeding Constitution on down to the adoption of the present one (all legislative construction) then the present Constitution must necessarily be held to have been adopted with the judicial construction theretofore placed upon this clause in previous Constitutions."

In the Hobbs case, Judge Ramsey, speaking for the majority of the court upon this question, the court plants its opinion squarely upon the same ground urged by Judge Henderson. The opinion states:

"We do not feel ourselves required to go into this question at length. It can no longer, we think, in this State be an open question

that where the testimony of a witness has been reduced to writing in a regular proceeding where opportunity for cross-examination has been afforded defendant and a witness has died or moved beyond the jurisdiction of the State, that on a final trial of the case this testimony will be admitted. Such testimony was admitted by our Supreme Court many years before the creation of this tribunal in the case of Greenwood v. The State, 35 Texas, 588, in 1871. This position has been maintained and upheld by this court beginning with the case of Black v. State, 1 Texas Crim. App., 369, in an unbroken line of decisions for more than a quarter of a century, and was never seriously questioned until the rendition of the opinion in the Cline case, 36 Texas Crim. Rep., 320.

"While the majority opinion in that case is a magnificent piece of legal reasoning and shows great research, it is so opposed not only to the decisions of this court, but practically every court of last resort on the American continent that we do not believe the temporary departure thus made from the settled rule of construction everywhere among the English speaking people should be an authority seriously regarded. In passing it may be stated that the ruling in the Greenwood case, the Black case and in the Porch case is in accordance with what has been the rule in England since 1654. This, too, is the rule in the Supreme Court of the United States where the question has often been considered. (See Mattox v. State, 156 U. S., 237), and under statutes similar to our own has been uniformly so held without a single dissent, so far as examination of the authorities go, in any court of last resort in America; so that without further discussion we are constrained by the overwhelming weight of authority to hold this contention adverse to appellant."

It will be observed that in neither of these decisions subsequent to the Cline case does the court undertake to deny that the language set forth in section 10 of the Bill of Rights, if given its ordinary, everyday simple meaning and construction, means that the accused should be confronted face to face in his trial before the jury by the witnesses testifying against him. They base their ruling upon the fact that in England the doctrine had been established that if at any stage of the proceedings the defendant was confronted with a witness and given the opportunity to cross-examine him, this fulfilled the constitutional requirement; that the Supreme Court of the United States and the Supreme Courts of other States had laid down the same doctrine and the same rule. It is true that the decisions cited from England do declare that this character of testimony is admissible, but we call attention to the fact that there is a very marked difference between the rights of a British subject and the rights of an American citizen or a citizen of Texas. Under the laws of Great Britain the king is the sovereign in whom is lodged all power. He rules over his subjects by alleged divine right, and his subjects enjoy no privileges and possess no rights except those

which the sovereign king sees proper to grant them. There was no specific grant of and no well defined rights of the subject in England for many centuries. Finally, the king was compelled to yield to the demands of his subjects and grant them specific privileges and rights demanded by them. The first was evidenced by the contract made between King John and some of his subjects at Runnymede when the king was compelled to sign the great charter. Subsequent to that time the subjects were granted other privileges and rights, and finally the king conceded that a parliament might be established, which should enact laws by which his subjects should be governed, all of which were to be subject to his approval.

The rule in America is that the American people are the sovereigns, and in them is lodged all power, and the agencies of government possess no authority save that which is delegated to them by the people in the written compact entered into between the people, which is styled the "Constitution," and the laws adopted by the representatives of the people in the Legislature assembled, consistent therewith.

Section 2 of the Constitution of the State of Texas is as follows: "All political power is inherent in the people, and all free governments are founded on their authority and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient."

Then follows the different guarantees to the citizen set forth in the Bill of Rights, and then the different branches of the government are set forth and the powers of each specifically stated and limited. So that we have to consider the situation of the citizen of the United States and of Texas, and the situation of the British subject as entirely distinct propositions, and in our opinion they are controlled by entirely different principles when it becomes necessary to consider and determine what are the rights of a citizen as set forth and guaranteed in the Bill of Rights.

It will be observed that Judge Henderson in his dissenting opinion states that there can be no doubt "that at common law, even in Great Britain, on the trial of a criminal case it was necessary to confront the accused with the witnesses against him." And when he comes to point out the exceptions to that rule (and it is to be noted that it is upon exceptions that he builds his entire argument) he says that "there are two other species of evidence which are admitted under this law, namely, the one as the dying declaration of a person who has received a fatal wound, and the other the examination of a prisoner and the deposition of the witness that may be produced against him taken officially before a justice of the peace, *by virtue of a particular Act of Parliament,* which authorizes

magistrates to take such examinations, and directs that they shall
be returned to the court of jail delivery, and that if the deponent
should die between the time of examination and the trial of the
prisoner his deposition may be substituted in the room of that viva
voce testimony which the deponent, if alive, alone could give, and is
admitted of necessity as evidence of the fact."

Here we have the exception to the rule in England which admits
this testimony by reason of a statute passed expressly for the pur-
pose of avoiding a rule of the common law and admitting the char-
acter of testimony in question, but, for which Act of Parliament it
would not have been admitted under the English common law rule.
Our Constitution admits of no exemption.

We wish to call attention to a portion of the argument of the opin-
ion in the decision of the Supreme Court referred to by Judge Hen-
derson and quoted from in his dissenting opinion in the Cline case,
and which is referred to in subsequent opinions, and which seems
to be relied upon as supporting the rule announced by them, viz., the
decision in the Mattox case referred to heretofore:

"The primary object of the constitutional provision in question was
to prevent depositions or ex parte affidavits, such as were sometimes
admitted in civil cases being used against a prisoner in lieu of a
personal examination and cross-examination of a witness in which
the accused has an opportunity not only of testing the recollection
and sifting the conscience of a witness, but of compelling him to
stand face to face with the jury in order that they might look at
him and judge by his demeanor upon the stand and the manner in
which he gives his testimony whether he is worthy of belief. There
is doubtless reason for saying that the accused should never lose
the benefit of any of these safeguards, even by the death of the
witness, and that if notes of the testimony are permitted to be read
he is deprived of the advantage of that personal presence of the
witness before the jury which the law has designed for his protection.
But general rules of this kind, however beneficent in their operation
and valuable to the accused, must occasionally give way to consid-
erations of public policy and the necessities of the case."

This Mattox case recognizes the fact that there is a guaranty in the
Constitution that the accused shall be confronted with the witness
against him; that the primary object of that provision was that he
might have the witness to stand face to face with the jury, in order
that they might look at him and judge of his demeanor upon the
stand and the manner in which he gave his testimony, as to whether
he was worthy of belief, and that that was a valuable right, and
that when he was deprived of that he was deprived of an advantage
which the law gave him, yet this court there says that notwithstand-
ing that fact, this right, advantage and protection must stand aside
and be swept away whenever in the opinion of the judges the rights

of the public become involved and the right of the accused should be disregarded.

In the opinion of the majority of the court in the Hobbs case, in referring to the opinion of the majority of the court in the Cline case, we find this expression: "While the majority opinion in that case (meaning the Cline case) is a magnificent piece of legal reasoning and shows great research, it is so opposed not only to the decisions of this court, but practically every other court of last resort on the American continent that we do not believe the temporary departure thus made from the settled rule of construction everywhere among the English speaking people should be an authority seriously regarded."

We do not think that an opinion, even though it be by the Supreme Court of the United States, which declares the framers of the Constitution had a specific purpose in reserving a certain right to an accused person, and that right is a valuable one and gives the defendant an advantage which is important to him in a contest between him and the government involving his life or liberty, that when the public interest gets into the scales as against the rights of the individual citizen, that the rights of the individual citizen will be disregarded and thrown to the wind, and the rights of the public respected and preserved. We do not believe that a decision announcing such a rule as that is to be "seriously regarded" by the courts of Texas. Neither do we think that any decision emanating from any court which proposed to "innovate" upon the Constitution or alter, change, amend, modify, qualify or abridge the plain and unmistakable language of the Constitution when the framers thereof have seen fit to reserve therein a right to a citizen which they have declared so sacred that it "shall remain inviolate" and that all laws contrary thereto emanating from whatever source shall be void, should be "regarded seriously."

Speaking for the writer alone, he does not hesitate to declare that he regards the Constitution and the Bill of Rights a sacred document; that every right preserved to the citizen in that document is so far as the established governments operating through their agencies are concerned, should remain inviolate; that no Legislature can add to or take from or change in any respect any right that is safeguarded to the citizen in that sacred document, nor will any declaration, rule or act whatever by the executive of this State ever impair or destroy or affect the rights of the citizen safeguarded in that document; that no judge-made law, no rule established by long lines of decisions, however old and however respected, can ever place an "innovation" upon any provision of that sacred document, and he believes that so long as the Constitution and Bill of Rights remain intact that the provisions thereof are "excepted out of the general powers of the government," and the plain, everyday, ordinary meaning of the language employed in the provisions thereof, and the

rights recognized and safeguarded to the citizen by the provisions thereof "shall forever remain inviolate," and he will not hesitate to declare on all occasions and at every opportunity that every law, no matter by what authority established, announced, set forth or promulgated contrary to said rights or which denies or deprives any citizen of any of said rights shall ever be valid.

We hold that any preliminary proceeding which antedates and precedes the formal presentation against the accused by a bill of indictment, charging him with a felony and to which he pleads not guilty, thereby joining issue between himself and the government, which issue is to be determined by a jury of his countrymen, does not or can not form any part of the "criminal prosecution" referred to in section 10 of the Bill of Rights.

Even if we were inclined to hold otherwise and concur in some of the decisions, holding, that if the accused is confronted by the witness against him in any part of the proceedings at any part of the criminal prosecution, would be sufficient compliance with the constitutional provision, which rule was announced by Judge Henderson in his dissenting opinion, yet we call attention to the language of section 10 of the Bill of Rights in speaking of this subject, which provides that "no person shall be held to answer for a criminal offense unless on the indictment of a grand jury, except in cases in which the punishment is by fine or imprisonment other than in the penitentiary," etc., clearly indicating that the trial referred to and the proceedings referred to above in the same section was clearly intended to mean a trial in which the guilt or innocence of the accused was to be determined by the jury, but for fear that there might be a misconstruction placed upon the language used in the first part of the section, the framers saw proper, although they had referred to a trial by an impartial jury, and that the defendant should be advised of the nature of the accusation against him, and that he should have a public trial, and that he should have the benefit of counsel and compulsory process for the witnesses against him, they went further and specifically declared "that no person shall be held to answer for a criminal offense (evidently meaning at such trial above mentioned) unless upon indictment."

Chief Justice Marshall, of the United States Supreme Court, in Ex parte Bollman, 4 Cranch, page 75, lays down the rule to be: "Before the accused is put upon his trial all the proceedings are ex parte," consequently the right of an accused to be confronted by the witnesses against him applies only to the trial.

We therefore adhere to the majority opinion of the court as announced in the Cline case, and expressly overrule the Porch case and Hobbs case and the Pratt case, and in fact every other case in Texas which has announced a contrary rule to that announced in the majority opinion in the Cline case.

The dissenting opinion of Presiding Judge Davidson in the Hobbs

case upon this question is so thorough, so exhaustive, and answers so completely the propositions stated and authorities cited by courts holding to the contrary rule announced that we incorporate the same in our opinion, and adopt it so far as we are concerned as the law of the State of Texas upon the subject under discussion:

"The evidence reproduced was taken before the examining court; the witness being shown absent from the State at the time of the final trial. In Cline v. State, 36 Texas Crim. Rep., 320, the writer discussed the question at considerable length with reference to reproducing the testimony of a deceased witness, holding it could not be done under that clause of the Constitution which guarantees the right to the accused to be confronted with the witnesses against him. My brethren have overruled the Cline case, stating practically that it is a universal rule to reproduce the testimony of a deceased witness. At page 312, Ency. of Evidence, it is stated that the tendency of the early decisions was greatly to limit or wholly to deny the admissibility on the final trial of evidence of a witness who could not be produced at the trial when his evidence had been given at a preliminary examination of the accused, citing, among other cases, in support of that, Finn v. Com., 5 Rand. (Va.), 701. In that case, among other things, it was said: 'In civil cases, if a witness who had been examined in a former trial between the same parties and on the same issue is since dead, what he swore on the former trial may be given in evidence; for the evidence was given on oath, and the party had an opportunity of cross-examining him. Peake, 60 Phill., 199. But we can not find that the rule has ever been allowed in a criminal case. Indeed, it is said to be expressly otherwise. Nor can we find that the rule in civil cases extends to the admission of evidence formerly given by a witness who has removed beyond the jurisdiction of the country. Much less can it be admitted in a criminal case.' Also see Brogy v. Com., 10 Grat., 722; Montgomery v. Com., 37 S. E. R., 841. These are Virginia cases. In People v. Newman, 5 Hill (N. Y.), 295, the court said: 'It seems to be well settled in this court that nothing short of the witness' death can be received to let in his testimony given on a former trial; but if the rules were otherwise in respect to civil cases, we are of opinion that it should not be applied to criminal proceedings.' It was also the rule in Tennessee until changed in the opinion in Kendrick, 10 Humph., 479, rendered in 1850, which overruled State v. Adkins, 1 Overt., 229. It seems to have been as well the rule in Missouri until the decision of McO'Blenis, 24 Mo., 402. This decision was rendered in 1857. The case of Montgomery v. Com., 37 S. E., 841, was rendered in February, 1901. It is unquestionably true that the earlier rule excluded the reproduction of testimony of all witnesses, whether dead or alive. Such was the rule practically in the history of the past until the Acts of Parliament in England. On a certain occasion the Jews sought to have the Apostle Paul brought to trial. The

old Roman judge stated with absolute confidence and without contradiction that it was the custom of the Romans not to try parties until they had been brought face to face with their accusers. The vast assemblage of the accusing Jews entered not a dissent to this statement of the Roman judge. It was too well settled as a law in the Roman Empire to bear contradiction. The Jews as well had been so instructed and taught under the laws of Moses, and from that time down the ages it was the rule, and wherever the jurisprudence of the past has touched the Anglo-Saxon civilization it has been the well-recognized rule until statute changed the rule in England. Under the common law it may be, I think, safely stated that it was an impossibility to reproduce such testimony in a criminal case, the reasons for which will be found by an investigation of the history of that great body of law. This was so well recognized in England that it took statutes at intervals, covering perhaps 200 years, to abrogate. The first Act was passed by Parliament authorizing the reproduction of testimony of dead witnesses. Years afterwards another statute was added, permitting the reproduction of evidence of witnesses who had become insane, and then followed still another statute, to wit: where the witness was kept away by the adverse party, and finally the reproduction was admitted when the witness was too sick to ever be able to be present at the final trial, or was permanently beyond the realm. These were statutory innovations, and it took in the neighborhood of 200 years to ingraft these exceptions upon the rule at common law inhibiting the reproduction of testimony. Even under the statute the reproduction of testimony was inhibited in cases of treason. The statute of England with reference to treason, in this connection, used practically the same language as adopted in our Constitution, and thus compelled the confronting of the accused with the witnesses against him when the party was on trial for that offense.

"Many expressions occur in the opinions in the United States to the effect that it was the rule at common law to reproduce the testimony of a dead witness, and even some of the opinions have gone far enough to hold that it was a rule at common law to reproduce the testimony taken at an examining trial. Suffice it to say that depositions were unknown to common law, and it may be further satisfactorily stated that depositions are never taken except under statutory authority. Therefore, this rule could not have existed at common law. In the United States it has been stated that such reproduction was a rule of evidence at common law, and especially so with reference to the evidence of a deceased witness. An examination of the history of the question will show that such was not the case when speaking of the common law proper. So in these States where this rule has been announced, doubtless an inspection, especially of the history of the earlier States, will show that the Legislatures of the respective States have adopted many of the Acts of Parliament, and in some all

Acts of Parliament have been adopted to a certain period. Some of these States adopted all Acts of Parliament down to 1688 as common law. The different States vary in fixing the time when the Acts of Parliament should become common law, some of them bringing it down even as late as 1776. It can be seen, then, very readily why the decisions in those States speak of the reproduction of such testimony as under the common law. It will be ascertained, I rather think, if an investigation of the jurisprudence of those States should be made, that the decisions had no reference to common law, properly speaking, but to the statutes adopted as common law. So there is no question in the opinion of the writer, that the earlier rule, as far back in history as the Jewish and Roman civilization, was that the accused must be confronted with the witnesses against him. The modern rule, however, has been adopted, and it has been done, as intimated, not by adhering strictly to the truth of the history of the question, but by reason of the statutes mentioned, reinforced by the rule of necessity. It would hardly be contended by any student of our jurisprudence, or that of England, from which we have largely borrowed, that prior to the Acts of Parliament it would be asserted that at common law the testimony of the dead or absent witness could be reproduced. In Texas we have not adopted the Acts of Parliament, but only the common law as such, properly speaking. So much for the question with reference to the reproduction of evidence generally, and of the testimony of the deceased witness specially.

"The decisions in regard to the reproduction of the testimony of an absent living witness is far from being harmonious or unanimous. The contrary rule finds support in a great many authorities, and it is more than difficult to say which is the prevailing rule. Some of the cases which deny the rule are here cited. People v. Newman, 5 Hill (N. Y.), 295; Finn v. Com., 5 Rand. (Va.), 701; Brogy v. Com., 10 Grat. (Va.), 722; State v. Houser, 26 Mo., 431; Collins v. Com., 12 Bush, 271; Pitman v. State, 92 Ga., 480; United States v. Angell, 11 Fed., 34; Ownes v. State, 63 Miss., 450; Motes v. U. S., 178 U. S., 459 et seq. Some of the cases hold that to receive the evidence of a witness who was merely absent is violative of the constitutional right of the accused to confront the witnesses against him. In the majority opinion the intimation is that when Texas became a Republic, and subsequently a part of the Federal Union, our Bill of Rights requiring the accused to be confronted with the witnesses against him was copied or taken from Constitutions of other States, and therefore when adopted, it was with the construction placed upon it in those States. This, perhaps, is a little difficult of historical confirmation, especially as it is not settled from which State Texas copied her Bill of Rights. Texas became an independent Republic in 1836, and was admitted into the Federal Union in 1845. At the time of our adoption of the Bill of Rights many of the States, if not a majority of them, had not adopted the later rule of repro-

ducing such evidence, but were operating under the old rule, which excluded such reproduction of evidence. As before stated, in Missouri, the rule seems to have been otherwise until 1857, as I understand the McO'Blenis case, supra. So it was in Tennessee until 1850, and it seems that it was not only so in Virginia then, but is still the rule, as well as perhaps in Georgia, as to absent witnesses. And it seems that under the cited cases it is so in Mississippi as to the absent witness. That the jurisprudence of Tennessee and Missouri entered largely into the general makeup of the organic law of Texas may be relied upon with some degree of confidence, by reason of the fact that those States furnished some of the great founders and statesmen who carved out Texas independence, gave her a national existence and contributed largely to her statesmanship, as well as to her legislation and jurisprudence. The Austins and the Bryans hailed from Missouri, while Crockett and Houston came from Tennessee. However, I do not propose to enter into the history of this question, or of the great men who made our constitutional laws as well as our jurisprudence. I mention these matters to especially call attention to the fact that the rule was more than doubtful even in regard to the deceased witness at the time of the formation of the organic law of the Republic of Texas, as well as of the State of Texas.

"The rule was not known in Texas jurisprudence until after the war between the States that the testimony of a deceased witness could be reproduced. Greenwood v. State, 33 Texas, 587. The intimation in that opinion is that it was necessary to so hold in order that the defendant might have the benefit of reproducing such testimony. Of course, this holding would not be correct inasmuch as the constitutional inhibition only applies to witnesses against the accused, not to those in his favor. It is, however, correct that the almost unbroken line of authorities in Texas since the Greenwood case sustains the rule authorizing the reproduction of such evidence. From Montgomery v. Com., supra, I make this quotation: 'Referring to the opinion in the Finn case, 5 Rand. (Va.), 701, he says, after stating that in civil cases, where the witness is since dead, what he swore on a former trial may be given in evidence, the judge proceeds, "But we can not find that the rule has ever been allowed in a criminal case. Indeed, it is said to be expressly decided otherwise, and all the judges concurred in the opinion that the evidence was inadmissible. This decision has never been controverted in Virginia since. The whole Criminal Code has since undergone a revision, but the rule as laid down in the Finn case has been acquiesced in by both the court and Legislature. I do not think it necessary, therefore, to go into an inquiry whether the rule was originally founded on proper principles or not. The rule has been established and recognized, and I think should be adhered to, and, whether a foundation had been laid for its introduction or not, the evidence was properly excluded." '

"In Motes v. U. S., supra, the Supreme Court of the United States, through Justice Harlan, in regard to absent witnesses, said: 'We are of opinion that the admission in evidence of Taylor's statement or deposition taken at the examining trial was in violation of the constitutional right of the defendants to be confronted with the witnesses against them. It did not appear that Taylor was absent from the trial by the suggestion, procurement, or act of the accused. . . . In Reynolds v. U. S., 98 U. S., 145, which was an indictment for bigamy committed in Utah . . . the trial court admitted proof of what a witness had stated on a former trial of the accused for the same offense, but under a different indictment. This court said the Constitution gives an accused the right to a trial at which he should be confronted with the witnesses against him; but, if the witness is absent by his own wrongful procurement, he can not complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps witnesses away he can not insist on his privilege. If, therefore, when absent by his procurement, evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.' In that case reference was made to several authorities, American and English, and the court further said: 'The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong, and consequently, if there has not been in legal contemplation a wrong committed, the way has not been opened for the introduction of the testimony. . . . In Reg. v. Scaife, 2 Den. C. C., 281, it was held by all the judges that the depositions were not admissible against the defendant who had not caused the absence of the witness. Lord Campbell, C. J., said: 'I am of opinion that the rule for a new trial must be made absolute. After having been given, the defendant Smith has resorted to a contrivance to keep the witnesses out of the way. The deposition was admissible against him; but it was not admissible against the other defendants, there being no evidence to connect them with the contrivance. The learned judge (Creswell, J.), in summing up to the jury, seems to have made no distinction as to the duty of the jury to consider the deposition of the absent witness as evidence against the defendant Smith alone, and not as against the others. The question, then, is whether such deposition is admissible against a prisoner without proof that the witness has been kept away by his contrivance, or without proof of the death of the witness. No case has yet gone so far, and I should be afraid to lay down a rule which would deprive a prisoner of the advantage of having the witnesses for the prosecution against him examined and cross-examined before the jury upon every matter that may be material to his defense. I therefore think that the deposition

was improperly admitted against Scaife and Rooke, and that there should be a new trial.' This opinion was delivered on May 21, 1900, by the Supreme Court of the United States, through Justice Harlan, one of our greatest jurists.

"I have seen proper to say this much, realizing that for the present it may be useless; but I am so firmly convinced that neither the courts, nor the Legislature, nor both combined, are at liberty, or intrusted with authority, to either overturn the plain language of the Constitution or ingraft upon its plain reading rules of necessity to meet untoward contingencies or inconveniences. If the rule of necessity is to be the criterion by which the Constitution is to be modified or changed, either by legislative enactment, decisions or courts, or both, then this rule can be, at the will of the dispensing or construing power, enlarged without limit. I wish to reiterate that there is no power under our form of government invested with authority to change constitutional provisions, except those who ordained the Constitution, and no emergency can become sufficiently urgent to authorize either or all departments of government combined to ingraft any rule of necessity upon the plain reading of that instrument, which is in the least a subversion of its provisions. In closing, I desire to incorporate in this opinion the following language found in 10 Am. Cr. App., at page 249, which is well worthy of careful perusal, thoughtful consideration, and perpetuation, and so well accords with the views of the writer that he takes the liberty of reproducing it verbatim:

"In all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him. What was the aim and object of this declaration found in the sixth amendment of the Federal Constitution, a counterpart of which is embodied in the Bill of Rights, in the Constitution of every State in the Union? Does it mean that, if the accused be confronted with the witnesses against him at a preliminary hearing, or coroner's inquest, the statements given in evidence on such rehearing or investigation may be given in evidence at the trial, should it appear that the witnesses were dead, or had gone beyond the seas? Not at all. Such a holding would virtually eliminate all of the declarations from the Bill of Rights. Under such conditions, how could the traverse jury discern the demeanor of the witness when on the stand? The paper testimony would not reproduce before the jury the facial expressions, the halting and changing of voice, the forced self-assertion and abandon, which so markedly reveal the character of the witness when testifying, and constitute almost unerring indications of the truth or falsehood of his testimony. History, reason and the philosophy of the law verify the force and correctness of the conclusion, that the aim and object of this declaration is to secure to the accused the right to be brought face to face with the witness testifying against him, before that jury which is the arbiter of his right to life or

liberty. Before reviewing some of the historic incidents which the
framers of the Constitution most likely had in mind when they
penned this declaration of right, let me here solemnly admonish
judges, especially of courts of review, to cling closely, with jealous
care, to the landmarks of the Constitution and to hold it their
bounden duty to see to it that no person, however humble, shall be
denied any right or privilege guaranteed him by that instrument.
My own experience and observation, at the bar and on the bench, in
the trial of criminal causes, emphasize the truth of the assertion that
notwithstanding the intellectual and moral advance of today over all
the ages which have gone before, the danger of innocent persons being
convicted to appease popular sentiment is just as great now as it
was when every official held his commission from the king. How
many times within the memory of us all have innocent men been
indicted by a star-chamber grand jury, tried and convicted at the
bar of public opinion through the powerful influence of the press,
and who would have been sent to the penitentiary, perchance to the
gallows, but for the timely interposition of friends or neighbors,
through whose aid the victims were enabled to employ counsel to
prepare their defense and establish their innocence. It is safe to
assume that the fathers of the Constitution could not have been
unmindful of the teachings of history, touching the Star Chamber
and the inquisition, those tribunals of infamy and terror, before
whom men were condemned to death upon the depositions and state-
ments in writing from witnesses unknown to the accused, or by
spurious confessions and admissions wrung from the prisoners by
torture and terror.

"The inestimable value of the right to the accused of being con-
fronted with one whose testimony is against him is most strongly
illustrated in the sacred writings, as well as in the history of crim-
inal jurisprudence. We are told that when Adam broke the Divine
command 'he hid himself from the face of the Lord.' After Peter
denied the Christ, when the Lord turned and looked upon him, he
remembered the word of the Lord, 'and Peter went out and wept
bitterly.' Luke xxii, 61, 62. Again, in Acts of the Apostles, c. 25,
when Paul was a prisoner at Cesarea, King Agrippa visited Festus,
the governor, and when the king had been there many days Festus
declared Paul's case unto the king: 'There is a certain man left in
bonds by Felix, about whom, when I was at Jerusalem, the chief
priests and the elders of the Jews informed me, desiring to have
judgment against him, to whom I answered: It is not the manner of
the Romans to deliver any man to die, before that he which is ac-
cused have the accusers face to face, and have license to answer for
himself concerning the crime laid against him.' When affidavits were
read to Mary, Queen of Scots, in prison, imputing to her great
crimes, the unfortunate queen answered: 'Who are the witnesses?
(for they were not even named to her). Bring them before me, and

they will forswear their falsehoods when they meet me face to face.' In 1589 Philip Howard, Earl of Arundel, was tried for high treason; Gerard and Shelby being witnesses against him. These witnesses accused him of having offered up his prayers for the success of the Spanish expedition against England. Arundel declared that his prayers were only for the preservation of himself and fellow Catholics from the general massacre, to which report had said they were doomed in the event of the Spaniards effecting the landing. Then fixing his eyes upon Gerard, and adjuring him to 'speak nothing but the truth, as he must one day stand before the tribunal of the living God to answer for what he should then say,' he so daunted and disconcerted the witness that he lost his utterance and was unable to repeat his first assertion. Sir Walter Raleigh was convicted of high treason chiefly upon the written statement of one Cobham, which he denied in a letter to Raleigh, but after reaffirmed in part in a letter to the lords, the evening before the trial. Upon the trial, Sir Walter Raleigh demanded that Cobham should be confronted by him. He appealed to the statute law, and to the law of God, which required two witnesses. He even offered to abandon his defense if his accuser would dare to assert, in his presence, that he had ever advised any dealing whatever with the Spanish monarch. He demanded again that his accuser stand forth, and if Cobham dared to reaffirm a single charge before his face he would submit in silence to his fate.

"It is unnecessary to multiply cases, for the whole record of each State trial is but the recital of judicial murders, planned by conscienceless and envious officials, and perpetrated through that inhuman system of jurisprudence which permitted affidavits, letters and depositions to be read in evidence against the accused. Judges, let me again admonish you to make the Constitution the touchstone of your official action."

It follows that the court erred in admitting the testimony complained of in this bill of exceptions, and we are of the further opinion that even if the admission of said testimony had not been in violation of the constitutional provision we have been discussing, the record shows that the same was not taken and preserved in the manner prescribed by the statute and therefore it would not be admissible upon that ground.

For the errors pointed out the case is reversed and remanded for another trial.

*Reversed and remanded.*

Harper, Judge, disqualified, by reason of having been of counsel for appellant.

PRENDERGAST, Judge (dissenting).—I concur in the disposition of this case. I do not concur in the decision on the question of reproducing the testimony of a deceased witness.

In my opinion it is unnecessary to decide that question in this case, and the opinion of the court in so deciding is obiter dicta. I regret the decision of this question in this case, because Judge Harper, one of the judges of this court, being recused, can not participate, and his opinion on the question can not therefore be had. In case his opinion on this question should concur with mine, this decision, as the court is now constituted, may be overruled when the question is reached in another case.

Section 10, article 1, of our present Constitution, which on this point is as follows: "In all criminal prosecutions the accused . . . shall be confronted with the witnesses against him . . ." is precisely the same as in every Constitution Texas has had, beginning with the Constitution adopted in 1836 by the Republic of Texas.

The first time this constitutional provision was construed was in 1856, when John W. Harris, O. C. Hartley and James Willie, who were appointed commissioners to prepare our Criminal Codes, under the authority of the Act of the Legislature of February 11, 1854, reported these Codes to the Legislature for adoption. The Code of Criminal Procedure, as prepared by them, which was enacted by the Legislature in 1856, had therein what is at present article 788, which authorized "the dying declaration of a deceased person to be introduced in evidence either for or against a defendant, when charged with the homicide of such deceased person," and has continuously been reenacted by the Legislature every time the Code of Criminal Procedure has been revised and reenacted since then. This article of the Constitution was first construed by the Supreme Court when composed of the old court in the case of Burrell v. State, 18 Texas, 713, in 1857, and said article of the Criminal Procedure, or rather evidence authorized by it, was then held not in violation of said constitutional provision. All the courts ever since then have adhered to that construction of said constitutional provision, as to evidence under said article 788, that is, dying declarations of the deceased.

The next time the question was construed by the Legislature was on November 10, 1866, which was the first Legislature after the adoption of the Constitution in June, 1866, when was passed what has continuously since then been article 814 of the Code of Criminal Procedure. By this article it was provided that "the depositions of the witness taken before any examining court or a jury of inquest, and reduced to writing, and certified according to law, in cases where the defendant was present when such testimony was taken and had the privilege afforded him of cross-examining the witness, may be read in evidence as depositions otherwise taken in a criminal case." This latter provision has also been reenacted by the Legislature each time since then when the statutes were revised and the Code of Criminal Procedure reenacted.

The next time it was construed was in 1871, by the Supreme Court,

in the case of Greenwood v. State, 36 Texas, 587, and it was held that such testimony introduced under said statute was not violative of said constitutional provision.

After all of these settled constructions, both 'by the Legislature and all the courts, the people by and through their representatives submitted to be adopted, the Constitution of 1876, which contained the identical language on this subject as in the other Constitutions adopted by Texas. This settled construction by the courts and by the Legislature was well known by the bench and bar of the State, and by the people. If the people had desired to reverse or change that construction, the Constitutional Convention of 1875, which drafted the Constitution of 1876, could and certainly would have so changed the language as to conclusively determine that the previous construction given by the courts and the Legislature, was wrong, and could and would have required a different construction. They not having done so, in my opinion, is conclusive of the fact that the construction that had been previously given was the true and correct construction of said constitutional provision, and that such construction was then entirely satisfactory to the bench, bar and people.

Besides this, the great weight of authority by the various Supreme Courts of the States, and the Supreme Court of the United States, both before and since then, have been in accord with this construction. And all the decisions of this court, by unanimous concurrence of all the judges, so held, until the Cline case was decided by a divided court in 1896. The decision in the Cline case, and those following it, were overruled in the Porch case in 1907.

It, therefore, seems to me that if there ever was a question of construction that is settled, this one has been, and that it should not be reopened in this or any other case.

Other pending cases presented for decision in this court renders it impracticable, if not almost impossible, for me to now take the time to write my views out at length on this question. If I deem it necessary I may do so at some later date.

I therefore respectfully dissent from the decision of the court in this case on that subject.